UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FLOODBREAK, LLC,
     Plaintiff,

     v.

ART METAL INDUSTRIES, LLC, et al.,
     Defendants.

No. 3:18-cv-503 (SRU)

## RULING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

FloodBreak, LLC ("FloodBreak") filed this patent infringement action against Art Metal Industries, LLC ("AMI") and its principal owner, Kevin F. Biebel (collectively, "Defendants"). The complaint alleges that Biebel and AMI are directly infringing and inducing infringement of FloodBreak's United States Patent No. 9,752,324 ("the '342 patent"), entitled "Flood Protection for Underground Air Vents."  It further alleges that Defendants' infringement is willful.

Defendants have moved for summary judgment on FloodBreak's claims against Biebel for direct and induced infringement, and against both Biebel and AMI for willful infringement. In support of their motion, they contend that:  (1) there is no evidence suggesting that Biebel is an alter ego of AMI, which defeats the direct infringement claim; and (2) Biebel could not have intended to induce infringement as a matter of law because, when Biebel learned of the '342 patent, he obtained an opinion of non-infringement from counsel and relied on that opinion in good faith, which defeats the indirect infringement claim.  Defendants additionally argue that, because they obtained and reasonably relied on an opinion of counsel, they are also entitled to summary judgment on the willful infringement claim.

As discussed below, I conclude that Biebel is entitled to summary judgment on the direct infringement claim because FloodBreak has not sufficiently shown that declining to pierce the

corporate veil would perpetuate a fraud or other injustice.  I further conclude that the record

sufficiently demonstrates that Biebel knew of the '342 patent and of a high likelihood that his

actions infringed on the patent months before he obtained an opinion of counsel, and that the

opinion of counsel is not reliable enough to foreclose a finding of intent in any event.  For those

reasons, I **grant** summary judgment to Defendants on the direct infringement claim against

Biebel; **deny** summary judgment on the indirect infringement claim against Biebel; and **deny**

summary judgment on the willful infringement claim against AMI and Biebel.

## I.        Standard of Review

A court shall grant summary judgment when the movant demonstrates that there is no

genuine dispute with respect to any material fact and that the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256

(1986).  When reviewing a summary judgment motion, a court must construe the facts of record

in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all

reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 158–59 (1970).

When a motion for summary judgment is properly supported by documentary and

testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or

denials of the pleadings and instead must present sufficient probative evidence to establish a

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v.*

*Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  To present a "genuine" issue of material fact, there

must be contradictory evidence "such that a reasonable jury could return a verdict for the non-

moving party."  *Anderson*, 477 U.S. at 248.  "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In that instance, "there can be 'no genuine issue as to any material fact,' because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (holding that a movant's burden is satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim).

## II.    Background

A.   Statement of Facts[1]

1.   *Background of AMI & Kevin Biebel*

AMI—an LLC with its principal place of business in Connecticut—manufactures and sells metal products. Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 144, at ¶¶ 2, 3; Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 3. According to AMI's testimony, AMI has a number of customers spanning various industries and, as of February 2019, had 18 employees with job functions that include welding, metal fabrication, polishing, painting, and assembly work. *See* Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 144, at ¶¶ 7, 8; Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶¶ 7, 8.

---

[1] The facts are primarily drawn from the parties' Local Rule 56(a)1 and Local Rule 56(a)2 Statements of Fact. Unless otherwise indicated, the facts are not disputed.

Among the products manufactured and sold by AMI are the mechanical closure devices ("MCDs") currently in dispute, which are designed to fit within air vents of the New York City subway system.  Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 144, at ¶ 10.  AMI sells its MCDs to two customers:  T. Moriarty & Sons, Inc. ("Moriarty") and Gramercy Group Inc. ("Gramercy").  *Id.* at ¶ 11.  Moriarty and Gramercy have each been awarded a contract from the MTA, part of which involves the installation of MCDs.  *Id.* at ¶ 12.

Biebel joined AMI in 2009 and rose to the ranks of Vice President in 2014.  *See* Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 144, at ¶¶ 4, 5; Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 5.  He purchased AMI from his wife in 2014 and now serves as CEO.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 84; Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 144, at ¶¶ 4, 5.  AMI has no directors, and Biebel testified that he is the company's only officer.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 83.

At his deposition, Biebel described his job responsibilities as "[j]ust about everything that pertains to running the company" and remarked that he is the "[c]hief cook and bottle washer" of AMI.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶¶ 85, 88.  Biebel confirmed that he "handle[s] all estimating, contract negotiations, manages [the] plant and is head of all R&D."  *Id.* at ¶ 86.  Biebel also confirmed that he is in charge of quality control and field project management.  *Id.* at ¶ 87.

From March to April 2017, Biebel wrote himself checks for thousands of dollars from AMI's checking account.[2]  *See id.* at ¶¶ 101, 102.  The memo line identified those checks as loans.  *Id.*  Citing to an email dated March 29, 2018, FloodBreak also contends that a bank

---

[2] Specifically, he wrote checks to himself for $5,000 on March 3, 2017; for $1,000 on March 15, 2017; for $1,200 on March 20, 2017; for $10,000 on March 22, 2017; for $15,000 on April 14, 2017; for $1,000 on April 18, 2017; for $5,000 on April 26, 2017; and for $500 on April 27, 2017.  *Id.* at ¶¶ 101, 102.

representative for an AMI account once wrote to Biebel: "Your deposit is all set. I also want to let you know your personal account is overdrawn. Would you like us to transfer funds for you." Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 104.

According to FloodBreak, AMI has not generated basic corporate financial documents such as profit and loss statements. *Id*. at ¶ 105. As support, FloodBreak points to the testimony of Defendants' damages expert that she previously asked for AMI's profit and loss statement, and was told that "it wasn't available." *Id*.

### 2. *MCD Contracts*

In early 2015, FloodBreak signed its first contract to supply its MCD units to Earth Construction Corporation. *Id*. at ¶ 57. Around that time, Christopher Taylor, an engineer with Arup Group Limited, had recommended Biebel as someone who might be able to assist with fabrication work or with local contacts to help with field inspections, shop drawings, or installation work. *Id*. at ¶ 58. Louis Waters, FloodBreak's President, then reached out to Biebel to see if Biebel could provide assistance. *Id*. at ¶ 59.

Waters testified that, in March 2016, he learned that Biebel had been bidding against FloodBreak on an MTA contract with "a copy of" FloodBreak's MCD. *Id*. at ¶ 61; Bannon Ex. 5, Doc. No. 176-5, at 224:9–228:4. He thereafter "explained to [Biebel] that [FloodBreak] had a patent pending on it." *Id*. Waters further testified that, after he informed Biebel of FloodBreak's patent application, Biebel said that "he would withdraw his bids because he didn't want to be in that situation." Bannon Ex. 5, Doc. No. 176-5, at 229:12–19. Biebel did not follow through on that promise.

a. Railroad Construction Company/Beach Erectors Contract

Railroad Construction Company ("RCC"), another MTA contractor, hired Beach Erectors as its subcontractor.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 65.  Biebel testified that Beach Erectors "was then to buy the MCDs from me. So I would have worked for Beach, Beach would have worked for RCC."  *Id.*

According to FloodBreak, on April 6, 2016, Biebel e-mailed RCC, informing them that he decided to manufacture a prototype MCD "to have for feel and touch in plant as well as wet test and certify to enable [RCC] to present same to MTA for approval."[3]  *Id.* at ¶ 90.  Biebel then asked Tucker Murphy from Beach Erectors to send him FloodBreak's drawings that were submitted with FloodBreak's bid.  *Id.* at ¶ 91.  Biebel instructed Murphy to "tell them you're planning how to install and need real numbers to understand means and methods - use the 37612 job as a reference - weights handling etc."  *Id.* at ¶ 92.  Murphy testified that he felt "[v]ery uncomfortable with the request" and that "it didn't feel right."  Bannon Ex. 15, Doc. No. 176-15, at 181:15–183:6.

Around July 8, 2016, Beach Erectors submitted to the MTA the first of many "Or-Equal" submissions for Biebel's "equal" of FloodBreak's MCD.  *Id.* at ¶ 64.  The MTA appears to have required contractors using MCDs supplied by companies other than FloodBreak to seek approval of the use of those MCDs as an alternative to the approved MCD model manufactured by FloodBreak.  *See* Doc. No. 142-3, at AMI 002899; Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 144, at ¶ 13.

As part of the "Or-Equal" submission, Biebel submitted a letter dated June 15, 2016, which stated that "[n]othing in our design infringes on patents pending or received for this device

---

[3] The next day, on April 7, 2016, FloodBreak's application for the '342 patent was published and publicly available.  *Id.* at ¶ 73.

or any IP rights owned by another manufacture[r]."  Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 144, at ¶ 54; Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 66.  The letter was "[s]worn and signed by" Biebel.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 67.

Biebel testified that he did not recall whether he consulted with an attorney before he wrote that or other patent assurance letters.  *See id*. at ¶ 72.  He further testified that he did not conduct a patent search beforehand because he "didn't feel it was necessary" and because "[w]hat I was doing was my own design."  Bannon Ex. 14, Doc. No. 176-14, at 72:5–73:2.  Murphy of Beach Erectors testified that the MTA required the letter from Biebel and that Beach Erectors relied on it.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 68.

On August 8, 2016, Kenneth Feng of New York City Transit e-mailed Michael Bruno of RCC about a Freedom of Information Law ("FOIL") request for AMI's "Or-Equal" submission.  *Id*. at ¶ 74.  In that e-mail, Feng wrote that FloodBreak submitted the FOIL request "to determine . . . whether AMI has infringed on FloodBreak's intellectual property/patent(s)."  Bannon Ex. 18, Doc. No. 176-18.  The e-mail was shared with Murphy and Biebel.  *Id*.

Murphy testified that, at least as of that date, he was aware that there was a patent infringement issue involving Biebel's MCDs.  Bannon Ex. 15, Doc. No. 176-15, at 171:24–72:2.  Murphy also opined that Biebel, too, "would certainly have been aware that there was a patent infringement issue" as of August 8, 2016.  *Id*. at 172:23–173:1.  Moreover, according to Murphy's testimony, Waters had shared with Murphy his opinion that there was a patent infringement problem with Biebel's MCDs and Murphy discussed "the patent infringement issue" with Biebel "[o]n occasion."  *Id*. at 172:3–172:15.

7

b.   Other Patent Assurance Letters

Biebel also submitted a patent assurance letter dated June 15, 2016 in connection with the

MTA-Zafra Minhas contract, declaring that "[n]othing in our design infringes on patents pending

or received for this device or any IP rights owned by another manufacture[r]."  Pl. Local Rule

56(a)2 Statement of Facts, Doc. No. 174, at ¶ 78.  The letter was "[s]worn and signed by" Biebel.

*Id*.  Biebel submitted another patent assurance letter dated November 16, 2016 as part of the "Or-

Equal" submission package in connection with the MTA-Moriarty contract, which again swore

that "[n]othing in our design infringes on patents pending or received for this device or any IP

rights owned by another manufacture[r]."  *Id*. at ¶ 79.

After the '342 patent was issued on September 5, 2017, Biebel submitted a patent

assurance letter dated October 10, 2017 as part of Gramercy's "Or-Equal" submission package.

*Id*. at ¶ 80.  In that letter, Biebel affirmed that "[n]othing in our design infringes on patents

pending or received for this device or any IP rights owned by another manufacture[r]."  *Id*. at ¶

80.

3.   *FloodBreak's Drawings*

On January 4, 2017, Biebel received Drawings B-511 to B-514 from Lauren Anchor of J-

Track LLC, which he referred to as "new drawings from MTA – (floodbreak)."  *See id*. at ¶ 95.

Biebel subsequently sent those drawings to his draftsman, Domenic Cartelli, instructing him to

"[g]o thr[ough] all of these new details and include in our drawings."  *See id*. at ¶ 96.

4.   *AYR's Opinion of Non-Infringement*

Guy Yale, a partner at the law firm Alix, Yale & Ristas ("AYR"), testified that Biebel

contacted him to request assistance with preparing a patent application in 2016.  Bannon Ex. 1,

Doc. No. 176-1, at 23:16–26:1.[4]  AYR thereafter assisted Biebel with prosecuting a patent

application for AMI's MCD.  *See id.* at 74:7–76:22; Bannon Ex. 14, Doc. No. 176-14, at 215:4–

17.

On February 22, 2018, Edmond Bannon, counsel for FloodBreak, sent a letter to AMI

accusing it of infringing FloodBreak's '342 patent.  Defs. Local Rule 56(a)1 Statement of Facts,

Doc. No. 144, at ¶ 25.  Biebel testified that, once he received the letter on February 23, 2018, he

forwarded a copy to Yale.  Ex. R, Doc. No. 142-18, at 213:3–214:1.  At Yale's deposition, Yale

noted that he and Tim Ceislak, an associate at the time, visited the AMI production facility to

inspect AMI's MCDs on March 6, 2018.[5]  *See* Defs. Local Rule 56(a)1 Statement of Facts, Doc.

No. 144, at ¶¶ 35, 40; Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶¶ 35, 40.  Yale

explained that, during the inspection, he orally communicated to Biebel that they were of the

strong opinion that AMI's MCD device did not infringe the '342 patent.  Defs. Local Rule 56(a)1

Statement of Facts, Doc. No. 144, at ¶ 41; Pl. Local Rule 56(a)2 Statement of Facts, Doc. No.

174, at ¶ 41.

As Yale testified, AYR's opinion that the AMI MCDs did not infringe the '342 patent is

memorialized in an internal two-page memorandum.  Doc. No. 142-21, at 50:7–17; *see also* Ex.

X, Doc. No. 162-24 (AYR's internal memorandum).  According to Yale, "the substance" of the

memorandum was verbally communicated to Biebel.  Doc. No. 142-21, at 50:7–17.  Yale

recalled orally advising Biebel that AMI's MCDs did not meet the "profile," "stops," and

"gravitational" features of the '342 patent claims.  *See id.* at 47:19–48:2.  Yale additionally

---

[4] As Yale testified, he received his law degree in 1976, started practicing as a patent attorney in 1979, and has since accumulated experience prosecuting patents and in patent litigation.  Ex. U, Doc. No. 142-21, at 8:8–16, 20:21–23:5.

[5] Yale testified that Ceislak had prepared "more than one or two opinions" before analyzing FloodBreak's infringement allegations, but that he did know exactly how many.  Doc. No. 142-21, at 121:23-22:02.

testified that he and Biebel "were involved in numerous telephone conversations throughout the period of maybe a month after that meeting with him."  Doc. No. 142-21, at 50:10–13.

B. Procedural History

FloodBreak filed the instant suit on March 26, 2018.  *See* Compl., Doc. No. 1.  As asserted in its complaint, FloodBreak alleges that Defendants infringed, and continue to infringe, multiple claims of the '342 patent by making, using, offering to sell, and selling MCDs covered by the '342 patent.  *Id*. at ¶¶ 21–22.  The complaint specifically alleges that AMI is directly infringing the patent and that, because AMI is the alter ego of Biebel, Biebel is also directly infringing the '342 patent.  *Id*.  The complaint further alleges that both Biebel and AMI are inducing infringement of the '342 patent, and that their infringement is willful.  *Id*. at ¶¶ 23–26.  FloodBreak seeks an order permanently enjoining Defendants' allegedly-infringing activities as well as monetary damages.  *Id*. at 7.

Defendants answered the complaint on May 11, 2018, doc. no. 23, and filed the instant motion on February 12, 2020 following the close of discovery, doc. no. 142.  FloodBreak opposed the motion on March 13, 2020, doc. no. 173, and Defendants replied on March 27, 2020, doc. no. 188.  Oral argument was held on June 11, 2020 on all pending motions.[6]

---

[6] Defendants have filed four other motions:  (1) a motion for summary judgment based on a patent license (doc. no. 60); (2) a motion for summary judgment of non-infringement and invalidity (doc. no. 147); (3) a motion to exclude testimony of FloodBreak's damages expert (doc. no. 135); and (4) a motion for summary judgment of no lost profits damages (doc. no. 130).  I address those in separate opinions.

### III.   Discussion

A.   Biebel is Not Liable for Direct Patent Infringement under 35 U.S.C. § 271(a) as a Matter of Law Because the Circumstances Do Not Justify Piercing the Corporate Veil Under Either the Identity or Instrumentality Rule.

The Patent Act provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent."  35 U.S.C. § 271(a).  "The 'corporate veil' shields a company's officers from personal liability for direct infringement [under 35 U.S.C. § 271(a)] that the officers commit in the name of the corporation, unless the corporation is the officers' 'alter ego.'"  *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010).  Accordingly, in order for corporate officers to be held personally liable for the direct infringement of a corporation under section 271(a), "there must be evidence sufficient to justify piercing the corporate veil."  *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990); *see also Wordtech Sys., Inc.,* 609 F.3d at 1313 ("To determine whether corporate officers are personally liable for the direct infringement of the corporation under § 271(a) requires invocation of those general principles relating to piercing the corporate veil.").

Because AMI was incorporated in Connecticut, Connecticut law governs the question whether AMI is the alter ego of Biebel.  *Chapco, Inc. v. Woodway USA, Inc*., 282 F. Supp. 3d 472, 481 (D. Conn. 2017) ("In determining whether to pierce corporate formalities because two entities are alter egos of each other, the court must apply the law of the state of incorporation, in this case Connecticut.").  Under Connecticut law, "[o]rdinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice."  *Naples v. Keystone Bldg. & Dev. Corp*., 295 Conn. 214, 233 (2010) (internal citations omitted).  "The improper use of the corporate form is the key to the inquiry."  *Id.*

As the Supreme Court of Connecticut has observed, "courts decline to pierce the veil of even the closest corporations in the absence of proof that failure to do so will perpetrate a fraud or other injustice." *Id*. at 234. "No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case." *Id*. at 233 (internal citations omitted). Whether the circumstances justify disregarding the corporate entity is a question of fact. *Id.* at 234 (internal citations omitted).

Connecticut courts have recognized two theories under which a corporate veil may be pierced: the "instrumentality" theory and the "identity" theory. *RBC Bearings, Inc. v. Thin Section Bearings, Inc.*, 2007 WL 2727160, at *1 (D. Conn. Sept. 18, 2007). Defendants argue that there is insufficient evidence to justify piercing the corporate veil under either rule. For the reasons that follow, I agree.

    a. Instrumentality Theory

To pierce the corporate veil under the instrumentality theory, a plaintiff must establish the following three elements:

> (1) "Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;"
>
> (2) that "[s]uch control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights;" and
>
> (3) that "the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

*Am. Wholesalers Underwriting, Ltd. v. Am. Wholesale Ins. Group., Inc*., 312 F. Supp. 2d 247, 257–58 (D. Conn. 2004) (citing *Zaist v. Olson*, 154 Conn. 563, 575 (1967)).

       i.   <u>A Reasonable Factfinder Could Conclude that Biebel Exercised Complete Domination over AMI.</u>

Courts consider a number of factors in determining whether an individual possesses the requisite level of control, including, as relevant here:  "(1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; [and] (6) the amount of business discretion by the allegedly dominated corporation."[7]  *Roth Staffing Companies, L.P. v. Brown*, 2016 WL 308773, at *4 (D. Conn. Jan. 25, 2016) (internal citations omitted).  "When proof is adduced on some or all of these factors are satisfied, courts may pierce the corporate veil to hold both the individual owner or shareholder and the dominant or more adequately capitalized corporation responsible for the dominated corporation's liabilities, making their assets available to satisfy judgments."  *Id*. at *8.

Applying the foregoing factors, I conclude that there is a genuine dispute of material fact regarding whether Biebel exercised complete domination over AMI.  This case is analogous to *Connecticut Light & Power Co. v. Westview Carlton Grp., LLC*, 108 Conn. App. 633, 641 (2008), where a Connecticut appellate court identified "more than ample evidence" to support the lower court's conclusion that the corporate veil should be pierced under the instrumentality test.  In so holding, the court emphasized, among other things, how funds were transferred out of the corporation to pay off personal loans, and how the corporate entity did not file tax returns or mandatory annual reports and lacked any other documentation required for a LLC.  *Id*. at 641.

---

[7] Courts also consider factors such as:  "(7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by the other corporations as if it were its own."  *Id.* (internal citations omitted).  Those factors, however, are not relevant here because they relate to multiple corporate entities, rather than a closely held corporation.  *In re Rouette*, 564 B.R. 157, 176 n.6 (Bankr. D. Conn. 2017).

Here, although FloodBreak points to no evidence indicating that AMI was or is undercapitalized,[8] AMI is similar in other respects to the corporation in *Connecticut Light & Power Co.* Of particular note, the record reflects an absence of basic corporate documents. As Defendants' damages expert testified, when she requested a profit and loss statement from AMI, she was informed that such a document was not available. Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 105. Moreover, according to FloodBreak, the only corporate financial documents produced were "scraps of paper," bank statements, invoices, and checks. Mem. in Opp., Doc. No. 173, at 16.

In addition, FloodBreak has adduced evidence demonstrating that funds were repeatedly transferred out of the corporation for personal rather than corporate purposes. For instance, FloodBreak has introduced multiple checks indicating that thousands of dollars were taken from AMI's checking account and given to Biebel as loans. Also revealing is an e-mail to Biebel from AMI's bank representative that states, "Your deposit is all set. I also want to let you know your personal account is overdrawn. Would you like us to transfer funds for you." Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 104.

Moreover, in *In re Rouette*, the court weighed how the defendant was solely responsible for the corporate entity's finances, policies, and business practices in concluding that the

---

[8] During oral argument, I asked FloodBreak's counsel if there was evidence that Defendants were undercapitalized. FloodBreak's counsel responded that Defendants were asked during a deposition whether, if there was a judgment of over ten million dollars, AMI would be able to pay it, to which Defendants replied in the negative. That fact, however, does not demonstrate that AMI has insufficient capital to operate its regular business, and thus does not support FloodBreak's assertion that AMI is undercapitalized. BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "undercapitalization" as "[t]he financial condition of a firm that does not have enough capital to carry on its business"); *In re Packaged Seafood Prod. Antitrust Litig*., 338 F. Supp. 3d 1118, 1155 (S.D. Cal. 2018) ("Adequate capitalization means capital reasonably regarded as adequate to enable [the corporation] to operate its business and pay its debts as they mature.") (internal quotation marks and citations omitted). Because a judgment has yet to be rendered in this case, the ten million dollar judgment in question is a purely hypothetical liability, rather than a prospective one. *Cent. Illinois Carpenters Health & Welfare Tr. Fund v. Struben*, 2009 WL 497393, at *16 (C.D. Ill. Feb. 24, 2009) ("'Undercapitalized' means that the company has failed to set aside 'unencumbered capital reasonably adequate for the corporation's prospective liabilities.'") (internal citations omitted).

evidence presented at trial established that the defendant exercised sufficient control over the corporation under the instrumentality rule.  564 B.R. 157, 175–76 (Bankr. D. Conn. 2017).  Here, too, the evidence reflects that Biebel enjoyed a wide range of responsibilities at AMI.  Biebel serves as AMI's CEO, and he testified that he is the sole officer of AMI and that there are no directors.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 83.  He described his job responsibilities as "[j]ust about everything that pertains to running the company" and remarked that he is the "[c]hief cook and bottle washer."  *Id*. at ¶¶ 85, 88.  He also testified that he "handle[s] all estimating, contract negotiations, manages [the] plant and is head of all R&D," and is in charge of quality control and field project management.  *Id*. at ¶¶ 86, 87.

For those reasons, and viewing the facts of record in the light most favorable to FloodBreak, I conclude that there is a triable issue regarding whether Biebel employed the requisite level of control over AMI to permit piercing of the corporate veil.

### ii.  Regardless, FloodBreak Has Failed to Sufficiently Show That Biebel Used His Control Over AMI to Perpetuate a Fraud or Wrong.

To prevail on the second prong, a plaintiff must establish that the individual defendant leveraged its control "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights." *Naples v. Keystone Bldg. & Dev. Corp.,* 295 Conn. 214, 233 (2010).  Courts have commonly pierced the corporate veil in patent infringement actions when the evidence suggests that the corporate entity is a legal fiction and was formed merely to escape liability.  For instance, in *Minnesota Min. & Mfg. Co v. Eco Chem, Inc.,* after the underlying patent infringement suit was filed, the founding officers stripped the infringing corporation of its assets, established a new corporation, and transferred the assets to the newly-formed corporation.  757 F.2d 1256, 1257–59 (Fed Cir. 1985).  The Minnesota district court concluded that the officers, as well as the new

corporation, were alter egos of the infringing corporate defendant and that the court therefore had personal jurisdiction over them.  *Id*. at 1264.

The Federal Circuit affirmed the decision on appeal, emphasizing how the officers "purposely manipulated" the infringing corporation "so as to thwart [the plaintiff's] recovery of its judgment." *Id*. at 1265.  The court observed that, "[t]his is precisely the situation in which courts feel most comfortable in using their equitable powers to sweep away the strict legal separation between corporation and stockholders." *Id*.

Similarly, in *Pfizer Inc. v. Synthon Holding, B.V.,* a case on which FloodBreak relies, a patentee brought a patent infringement action against three companies based on their abbreviated new drug application ("ANDA") for a generic equivalent to the patentee's medication; one of the defendants, Synthon Labs, later moved to dismiss for lack of personal jurisdiction.  386 F. Supp. 2d 666, 670–71 (M.D.N.C. 2005).  The North Carolina district court denied the motion.  *Id.* Applying North Carolina's instrumentality test, which is identical to Connecticut's, the court reasoned that Synthon Labs was the alter ego of the two other corporate defendants, Synthon Pharma and Synthon Holding, both of which were based in North Carolina.  *Id*. at 670–71, 677– 79.  Central to the court's conclusion was that "Synthon Labs was created solely to file the ANDA for Synthon Pharma and Synthon Holding in an effort to manipulate jurisdiction regarding the ANDA." *Id*. at 679.

Moreover, in *Chapco, Inc. v. Woodway USA, Inc.*, two corporations, Chapco and Samsara, brought an action seeking a declaratory judgment that their treadmill products did not infringe Woodway's patent.  282 F. Supp. 3d 472, 476 (D. Conn. 2017).  The plaintiffs thereafter moved for summary judgment on Woodway's counterclaims that they directly and indirectly

infringed its patents and were the alter egos of Brian Weinstein, who was the president of Chapco and the managing member of Samsara.  *Id*. at 479–82.

District Judge Janet C. Hall denied the motion on the alter ego claim, concluding that a genuine issue of fact existed regarding whether Chapco and Samsara were the alter egos of Weinstein.  *See id*. at 481–82.  Although Judge Hall did not explicitly conclude that the corporations were formed to evade liability, she relied on facts illustrating that the corporations were undercapitalized and heavily dependent on Weinstein—namely, that (1) Weinstein had personally guaranteed the debts of both corporations; (2) Samsara had a year-to-date loss of around $340,000; and (3) Samsara owed Chapco $800,000 with no current payment plan.  *Id*. Judge Hall also noted that Samsara had no employees of its own.  *Id*. at 482.

Unlike *Minnesota Min*., *Pfizer*, and *Chapco*, there is no evidence here indicating that AMI is undercapitalized or that it was created solely to escape liability for patent infringement. On the contrary, the record establishes that AMI existed years before it manufactured and sold the MCDs at issue, that it has 18 employees, and that it creates and sells metal products to a number of different customers.  Although Biebel might have transferred several tens of thousands of dollars out of AMI's bank account in the first half of 2017, there is no evidence to suggest that he did so to evade a judgment in this lawsuit, which was filed in 2018.

Those facts render the case analogous to *Manville Sales Corp. v. Paramount Sys., Inc.,* where the Federal Circuit reversed a Pennsylvania district court's decision, following a bench trial, to pierce the corporate veil and hold the corporate officers personally liable for direct patent infringement based on its finding that the officers helped copy the design.  917 F.2d 544, 552–53 (Fed. Cir. 1990).  On appeal, the Federal Circuit concluded that such assistance was within the

17

scope of the officers' employment and, therefore, the officers could not have been "attempting to avoid liability under the protection of the corporate veil." *Id*. at 553.

Applying the standard set forth in *Manville*, the Southern District of New York in *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.* similarly concluded that there was no basis to pierce the corporate veil and hold a parent company liable for the alleged infringement of its subsidiary. 361 F. Supp. 2d 210, 216–17 (S.D.N.Y. 2005).  As in the case at bar, the plaintiffs in *Aspex Eyewear* "offered no evidence that recognizing the separate corporate existences of [the subsidiary] and [the parent] would permit [the parent] to commit fraud and illegitimately escape liability." *Id*. at 217.  There was likewise no evidence that the parent company had "undercapitalized [the subsidiary] or diverted assets from it in order to avoid liability." *Id*.

FloodBreak's assertion that the veil must be pierced because Biebel spearheaded the design, manufacture, and sale of the allegedly infringing MCDs is unavailing.  As the Federal Circuit instructed in *Manville*, those actions do not rise to the level of a wrong sufficient to justify the extreme remedy of disregarding AMI's corporate existence.  917 F.2d at 552–53. Indeed, as the District of Delaware in *Mobil Oil Corp. v. Linear Films, Inc.* reasoned:

> Any breach of contract and any tort—such as patent infringement—is, in some sense, an injustice. Obviously this type of "injustice" is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud. The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping.

718 F. Supp. 260, 268 (D. Del. 1989).

In the absence of any evidence indicating that AMI is a legal fiction or undercapitalized, or that declining to pierce the corporate veil would allow Defendants to escape liability, a reasonable factfinder could not find that exceptional circumstances warrant holding Biebel

directly liable for AMI's actions.  For those reasons, FloodBreak cannot sufficiently demonstrate that the second prong is met and thus cannot satisfy the instrumentality test as a matter of law.[9]

> b.   Identity Rule

I further conclude that there is no triable issue regarding whether the identity rule has been satisfied.  Under the identity rule, a plaintiff must show that:  (1) "there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun;" and (2) "an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise."  *Naples*, 295 Conn. at 232–33 (internal citations omitted).

As discussed with respect to the instrumentality test, FloodBreak has sufficiently demonstrated that Biebel had the requisite level of control over AMI and has therefore satisfied the first element of the identity test.  *Roth Staffing Companies, L.P.*, 2016 WL 308773, at *4 (noting that courts consider the same factors in determining whether an individual has exercised the requisite amount of control under either the instrumentality or identity rule).  Regardless, because FloodBreak has failed to put forth evidence suggesting that declining to pierce the corporate veil would allow Defendants to escape liability, FloodBreak's claim fails on the second prong.  *Naples,* 295 Conn. at 236–38.

For the above reasons, I conclude that FloodBreak has failed to sufficiently demonstrate that disregarding AMI's corporate form is warranted in this case, and **grant** Defendants' motion for summary judgment with respect to the direct infringement claim against Biebel.

---

[9] Because FloodBreak's argument fails on the second prong, I need not address whether the third prong is met.

B. <u>A Reasonable Juror Could Conclude that Biebel Induced Patent Infringement under 35</u>
<u>U.S.C. § 271(b).</u>

Biebel also moves for summary judgment on the inducement claim against him,

contending that he could not have harbored the requisite intent because he obtained an opinion of

non-infringement from counsel promptly after he learned of the '342 patent.  Mot. for Summ. J.,

Doc. No. 143, at 11–13.  I disagree.

Under 35 U.S.C. § 271, "[w]hoever actively induces infringement of a patent shall be

liable as an infringer."  35 U.S.C. § 271(b).  "[C]orporate officers who actively assist with their

corporation's infringement may be personally liable for inducing infringement regardless of

whether the circumstances are such that a court should disregard the corporate entity and pierce

the corporate veil."  *Lego Sys. A/S v. Rubicon Commc'ns, LP*, 2017 WL 2423051, at *3 (D.

Conn. June 5, 2017) (citing *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d

1308, 1316 (Fed. Cir. 2010); *Global Traffic Techs. LLC v. Morgan*, 620 F. App'x 895 (Fed. Cir.

2015)) (emphasis omitted).

In order to succeed on an inducement claim, "the patentee must establish first that there

has been direct infringement, and second that the alleged infringer knowingly induced

infringement and possessed specific intent to encourage another's infringement."  *ACCO Brands,*

*Inc. v. ABA Locks Mfrs. Co*., 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal citations and

quotation marks omitted).  Specific intent requires a showing that the alleged infringer "knew of

the patent in question and knew the induced acts were infringing."  *Commil USA, LLC v. Cisco*

*Sys., Inc*., 135 S. Ct. 1920, 1927 (2015) (*citing Global-Tech Appliances, Inc. v. SEB S.A.*, 563

U.S. 754 (2011)).

"The inducement knowledge requirement may be satisfied by a showing of actual

knowledge or willful blindness."  *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir.

2015).  Willful blindness is a stringent standard, and requires that (1) "[t]he defendant must subjectively believe that there is a high probability that a fact exists," and (2) "the defendant must take deliberate actions to avoid learning of that fact."  *Global-Tech*, 563 U.S. at 769. "Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  *Id.*

Here, as an initial matter, it is well-settled that Biebel cannot be held liable under section 271(b) for actions before the '342 patent was issued, which was on September 5, 2017.  *See National Presto Industries, Inc. v. West Bend Co*., 76 F.3d 1185, 1196 (Fed. Cir. 1996) ("[A]s a matter of law § 271(b) does not reach actions taken before issuance of the adverse patent."). Nonetheless, the record raises genuine issues regarding whether, after September 5, 2017, Biebel willfully blinded himself to the infringing nature of the sales that he facilitated.

Construing all inferences in FloodBreak's favor, a reasonable factfinder could conclude that he was willfully blind to, if not knowledgeable of, infringement as early as October 10, 2017.  That day, Biebel submitted a patent assurance letter as part of Gramercy's "Or-Equal" submission package.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶ 80.  In that letter, he guaranteed that "[n]othing in our design infringes on patents pending or received for this device or any IP rights owned by another manufacture[r]."  *Id.*  A reasonable factor could infer from the letter that Biebel performed a patent search to assure the MTA that no infringement issues existed and, in doing so, came across FloodBreak's '342 patent.[10]

---

[10] I am aware that Biebel testified that he did not remember whether he consulted with an attorney before he wrote the patent assurance letters and that he did not conduct a patent search beforehand.  *Id.* at ¶ 72; Bannon Ex. 14 Vol. 1, Doc. No. 176-14, at 72:5–73:2.  But the credibility of Biebel's testimony is a question for the jury.  *U.S. Philips Corp. v. Windmere Corp*., 861 F.2d 695, 704 (Fed. Cir. 1988) ("The jury was not required to accept his expert testimony, even if it was uncontradicted.").  And as the Federal Circuit instructed, "[w]hile proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice."  *DSU Med. Corp. v. JMS Co*., 471 F.3d 1293, 1306 (Fed. Cir. 2006) (internal citations omitted).

A reasonable juror could further conclude that, once Biebel learned of the patent in October 2017, he subjectively believed that there was a "high probability" that his MCDs infringed the '342 patent and "took deliberate actions to avoid learning whether it actually did" until at least February 2018, when he sought an opinion of counsel. *Info-Hold, Inc.*, 783 F.3d at 1373.  That conclusion is buttressed by the evidence indicating that Biebel was previously put on notice of possible future infringement.  For example, the August 8, 2016 e-mail from New York City Transit, which discussed the FOIL request for AMI's "Or-Equal" submission "to determine . . . whether AMI has infringed on FloodBreak's intellectual property/patent(s)" was forwarded to Biebel.  Bannon Ex. 18, Doc. No. 176-18.  In addition, Murphy testified that he and Biebel discussed "the patent infringement issue" on occasion, and that Biebel "would certainly have been aware that there was a patent infringement issue" as of August 8, 2016.  Bannon Ex. 15, Doc. No. 176-15, at 172:14–172:16, 172:23–73:1.

Also revealing is the e-mail exchange dated January 4, 2017, which indicates that Biebel received a number of FloodBreak's MCD drawings and forwarded them to his draftsman, instructing him to "[g]o thr[ough] all of these new details and include in our drawings."  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 174, at ¶¶ 95, 96.  Defendants counter that the drawings are openly available specifications that the MTA had distributed to interested parties bidding to supply an "or-equal" MCD.  Reply, Doc. No. 188, at 1–2.  Construing all ambiguities in FloodBreak's favor, however, a reasonable juror could conclude that the exchange illustrates that Biebel knowingly copied FloodBreak's MCD technology, which could support a finding of induced infringement.  *Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, 2014 WL 4090550, at *8 (N.D. Cal. Aug. 19, 2014) ("Evidence supporting an inference of copying may also be relevant to proving induced infringement.").

Taken together, the evidence is more than sufficient for a reasonable juror to find that, as early as October 2017, Biebel knew that the '342 patent existed, subjectively believed that there was a high probability that AMI's manufacture and sale of competing MCDs infringed the patent, and deliberately avoided confirming that it did until at least February 2018.  *See Info-Hold, Inc.*, 783 F.3d at 1373 (concluding that issues of material fact existed regarding whether the alleged infringer, Muzak, had knowledge that its actions constituted patent infringement when the evidence suggested that the patentee "repeatedly contacted Muzak in an effort to put Muzak on notice of the '374 patent and Muzak's patent infringement" and counsel for Muzak failed to investigate the infringement claims).  Accordingly, a reasonable juror could find that, from October 2017 to at least February 2018, Biebel intended to induce patent infringement.

Moreover, the record raises triable issues regarding whether Biebel continued to induce infringement with the requisite intent after he received FloodBreak's letter on February 23, 2018 accusing Defendants of infringing the '342 patent.  Defendants mount the defense that Biebel could not have possessed the necessary intent because, immediately after he received the letter, he sought an opinion from his patent counsel, who advised him that the MCDs did not infringe the patent.  Mot. for Summ. J., Doc. No. 143, at 12–13.  I am not persuaded.

The existence of an opinion of counsel, although significant, does not automatically warrant summary judgment for the defendants on an induced infringement claim.  *SEB, S.A. v. Montgomery Ward & Co.,* 412 F. Supp. 2d 336, 345 (S.D.N.Y. 2006) ("Defendants cannot avoid liability under § 271(b) simply because they obtained opinions from counsel.").  In order for an opinion of counsel to help preclude liability under section 271(b), the opinion must be competent and the alleged infringer must have reasonably relied on it.  *SDS USA, Inc. v. Ken Specialties, Inc*, 2002 WL 31055997, at *7–*8 (D.N.J. Aug. 28, 2002) (denying motion for summary

judgment on a section 271(b) claim because genuine issues existed regarding whether the defendant "relied on the opinion of counsel in good faith and if so, whether such reliance was reasonable"); *see also Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed. Cir. 1998) ("Those cases where willful infringement is found despite the presence of an opinion of counsel generally involve situations where opinion of counsel was either ignored or found to be incompetent.") (internal citations omitted).

In assessing whether an opinion of counsel was competent, and whether it was reasonable for the accused infringer to rely on such guidance, courts consider the following factors:  "(1) whether counsel examined the patent file history; (2) whether the opinions were oral or written; (3) the objectivity of the opinions; (4) whether the attorneys rendering the opinions were patent lawyers; (5) whether the opinions were detailed or merely conclusory; and (6) whether material information was withheld from the attorney."  *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117, 1121 (E.D. Cal. 2002) (citing *Comark Communications, Inc.*, 156 F.3d at 1190–93; 7 Chisum, Chisum on Patents § 20.03[4][b][v][D], at 20–368 to 20–374 (2002)) (analyzing whether advice of counsel negated willful infringement liability, which encompasses the same test—whether reliance was reasonable—as the induced infringement analysis).  Courts also consider "the level of the defendant's sophistication (especially about patent issues)."  *Sharper Image Corp. v. Honeywell Int'l, Inc.,* 222 F.R.D. 621, 632 (N.D. Cal. 2004) (addressing willful infringement claim).

The test is an objective one:  "the focus should be on how a reasonable client, similarly situated, would view the advice she received—whether it was reasonable for her to view the opinion as 'competent.'"  *Id.* at 633.  "In pursuing this question, what is most important is what

the client could see, what the client knew, and whether the client should have been satisfied or should have asked for more." *Id*.

Applying the foregoing principles, I conclude that FloodBreak has sufficiently challenged the reliability of AYR's opinion for multiple reasons. *First*, although Yale testified that their opinion of non-infringement is memorialized in an internal memorandum (doc. no. 162-24), the evidence suggests that the memorandum was never shared with Biebel. Instead, Yale testified that "the substance" of that memorandum was conveyed orally. Doc. No. 142-21, at 50:7–17. As the Federal Circuit has observed, "oral opinions are not favored" and "carry less weight." *Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed. Cir. 1992).[11]

*Second*, a reasonable juror could find the memorandum, and therefore Yale's oral opinion, defectively conclusory. The first page of the memorandum identifies three features of the four independent claims recited in the '342 patent—stops, profiles, and gravitational impetus—as significant for the infringement analysis and provides a brief overview of each feature. Ex. X, Doc. No. 162-24, at 2. The second page discusses, for half a page, various characteristics of AMI's MCDs and concludes that the MCDs do not contain the three key elements recited in the '342 patent. *Id*. at 3. For the second half of the page, the memorandum summarizes the prosecution history of the '342 patent. *Id*.

In my view, a reasonable factfinder could find the memorandum inadequate to defeat a finding of inducement, principally because the two-page analysis is cursory and does not cite to

---

[11] One reason why oral opinions are not favored is because "they have to be proved perhaps years after the event, based only on testimony which may be affected by faded memories and the forces of contemporaneous litigation." *Minnesota Min. and Mfg. Co.*, 976 F.2d at 1580.

any law.[12]  *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1467 (Fed. Cir. 1997) ("To serve as exculpatory legal advice the opinion of counsel is viewed objectively, to determine whether it was obtained in a timely manner, whether counsel analyzed the relevant facts and *explained the conclusions in light of the applicable law*, and whether the opinion warranted a reasonable degree of certainty that the infringer had the legal right to conduct the infringing activity.") (emphasis added); *Applera Corp. v. MJ Research Inc.*, 372 F. Supp. 2d 233, 240 (D. Conn. 2005) (discrediting counsel's opinion of noninfringement when the opinion "provided a only conclusory statement, without any citation to applicable legal authority").

Moreover, although the memorandum premises its conclusion of non-infringement on the absence of three claim limitations—stops, profiles, and gravitational impetus—in AMI's MCDs, it offers no meaningful analysis on the proper construction of those limitations.  Its discussion of the patent's prosecution history is also fatally conclusory.  Without citing to any law in support, the memorandum asserts that "under the theory of prosecution history estoppel, it would seem that *solely* by gravitational impetus is required by *all* independent claims"—an interpretation that I rejected in my claim construction ruling.  Doc. No. 162-24, at 3 (emphasis added); Claim Construction Order, Doc. No. 94, at 9–12 (concluding that "AMI's suggested meaning of the term 'gravitational rotation' cannot be applied generally throughout the patent" and that one of ordinary skill in the art would not incorporate "only" into the definition of "gravitational impetus" as used in claims 23 and 24).  Those defects weigh against a determination that a reasonable jury could only find reasonable reliance.  *Coition, Inc. v. Becton Dickinson Vascular*

---

[12] Defendants note that, on March 12, 2018, Yale sent a letter to Bannon, counsel for FloodBreak, conveying his opinion that AMI did not infringe the '342 patent, and that both Yale and Biebel believe that Yale sent a copy of the letter to Biebel.  Doc. No. 143, at 6; *see also* Ex. Y, Doc. No. 142-25 (letter from Yale to Bannon).  Regardless, the letter does not support Defendants' reasonable reliance argument because the letter contains even less detail than the memorandum.

*Access, Inc.*, 120 F.3d 1253, 1259–60 (Fed. Cir. 1997) (holding that the district court clearly erred in determining that the opinion of counsel negated willful infringement claim, partly because the opinion included "no interpretation of claim language" and "no meaningful discussion of the prosecution history").

      *Third*, Defendants concede that AYR had prosecuted AMI's patent application relating to its MCDs, doc. no. 143, at 14, which calls AYR's objectivity into question. *See Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117, 1125 (E.D. Cal. 2002) (concluding that evidence that an attorney prosecuted several patents for the alleged infringer reasonably raised questions about the objectivity of the attorney's opinion of non-infringement).

      *Fourth*, although the evidence is thin, FloodBreak has proffered sufficient evidence from which a reasonable jury could infer that Biebel did not share "material information" with AYR for its infringement analysis, which counsels against a finding of reasonable reliance. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed. Cir. 1998) ("Whenever material information is intentionally withheld, or the best information is intentionally not made available to counsel during the preparation of the opinion, the opinion can no longer serve its prophylactic purpose of negating a finding of willful infringement."). For example, the evidence suggests that Biebel did not forward to AYR his e-mail to his draftsman that instructed him to through the details of FloodBreak's drawings and include them in AMI's drawings. As discussed, that evidence is probative of induced infringement, of which FloodBreak's cease and desist letter accuses Biebel.

      To be sure, the memorandum does state that the file history for the '342 patent was reviewed, and Yale and Ceislak were patent lawyers. Further, contrary to FloodBreak's contention, I do not believe the mere fact that AMI had a patent application pending reasonably

suggests that Biebel was "highly sophisticated in matters of patent law " prior to the instant

litigation. *Johns Hopkins Univ. v. CellPro, Inc.,* 152 F.3d 1342, 1364 (Fed. Cir. 1998).

On balance, however, a reasonable jury could find that most—four out of seven—of the

relevant factors counsel against a finding that Biebel reasonably relied on the opinion of counsel.

I therefore conclude that genuine issues of material fact exist regarding whether Biebel intended

to induce infringement, and **deny** Defendants' motion for summary judgment on the induced

infringement claim against Biebel.

C.  <u>FloodBreak Has Sufficiently Demonstrated that Biebel and AMI Willfully Infringed the
    '342 Patent.</u>

Both Biebel and AMI additionally move for summary judgment on the willful

infringement claim, propounding the same argument as with respect to induced infringement—

that is, that FloodBreak cannot show actual knowledge because Biebel promptly sought an

opinion of counsel.  Mot. for Summ. J., Doc. No. 143, at 15–16.   That argument is equally

unavailing here.

Section 284 of the Patent Act provides that, in a case of infringement, courts "may

increase the damages up to three times the amount found or assessed." *Halo Elecs., Inc. v. Pulse

Elecs., Inc.,* 136 S. Ct. 1923, 1928 (2016) (citing 35 U.S.C. § 284).  In *Halo Electronics*, the

Supreme Court instructed that awards of enhanced damages are "not to be meted out in a typical

infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious

infringement behavior." *Id*. at 1932.  It further clarified that "[t]he subjective willfulness of a

patent infringer, intentional or knowing, may warrant enhanced damages, without regard to

whether his infringement was objectively reckless." *Id*. at 1933.  Subjective willfulness, in turn,

may be established when "the risk of infringement 'was either known or so obvious that it should

have been known to the accused infringer.'" *Id*. at 1928 (citation omitted).  "[C]ulpability is

generally measured against the knowledge of the actor at the time of the challenged conduct." *Id*. at 1933.

Accordingly, "[t]he question of willful infringement turns on whether, at the time of [the defendant's] infringement, [the defendant] knew or, it was so obvious that [the defendant] should have known, that its actions constituted infringement of a valid and enforceable patent." *Apple Inc. v. Samsung Elecs. Co.*, 258 F. Supp. 3d 1013, 1027 (N.D. Cal. 2017) (internal citations and quotation marks omitted).  Facts substantiating a claim of induced infringement can also support a claim of willful infringement.  *Pres. Techs. LLC v. MindGeek USA Inc.,* 2019 WL 3213585, at *4 (C.D. Cal. Apr. 2, 2019) (concluding that the allegations of knowledge relating to an induced infringement claim supported a claim for willful infringement).

For the reasons discussed with respect to induced infringement, I conclude that FloodBreak has sufficiently shown that, by October 2017, Biebel was well aware that his actions amounted to patent infringement.  Specifically, a reasonable juror could infer from Biebel's October 10, 2017 patent assurance letter that Biebel conducted a patent search beforehand and, as a result, learned that FloodBreak's MCD technology had been patented.  Because FloodBreak and an MTA subcontractor had raised patent infringement concerns with Biebel previously, a reasonable factfinder could conclude that, once Biebel learned of the patent in October 2017, it became "so obvious" that continuing to place AMI's MCDs on the market would constitute infringement.  That is particularly so in light of the evidence suggesting that Biebel copied FloodBreak's drawings.  *See Apple Inc. v. Samsung Elecs. Co.,* 258 F. Supp. 3d 1013, 1028 (N.D. Cal. 2017) (discussing how evidence of copying supports a finding of willfulness).

AYR's opinion of non-infringement is not enough to defeat the willful infringement claim at this stage.  As is the case with induced infringement claims, courts have recognized that

reasonable reliance on competent advice of counsel can foreclose a claim of willful infringement. *See, e.g., Vulcan Eng'g Co. v. Fata Aluminum, Inc.,* 278 F.3d 1366, 1378–79 (Fed. Cir. 2002) ("[T]he focus [of willful infringement] is generally on whether the infringer exercised due care to avoid infringement, usually by seeking the advice of competent and objective counsel, and receiving exculpatory advice. When it is found that the infringer acted without a reasonable belief that its actions would avoid infringement, the patentee has established willful infringement, which may be accompanied by enhanced damages.").

Here, a reasonable factfinder could conclude that Biebel's reliance on AYR's opinion was unreasonable because:  (1) the opinion was conveyed orally; (2) the memorandum on which the oral opinion was based was conclusory; (3) AYR prosecuted a patent application for AMI for a related technology; and (4) Biebel may not have shared with AYR important evidence relating to intent.

I therefore conclude there is a material question for the jury regarding whether Biebel and AMI willfully infringed the '342 patent, and **deny** Defendants' motion for summary judgment on the willful infringement claim.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is **granted in part** and **denied in part**.  It is **granted** with respect to the direct infringement claim against Biebel; **denied** with respect to the indirect infringement claim against Biebel; and **denied** with respect to the willful infringement claim against AMI and Biebel.

So ordered.

Dated at Bridgeport, Connecticut, this 3rd day of September 2020.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge