## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FLOODBREAK, LLC,
    Plaintiff,

    v.

ART METAL INDUSTRIES, LLC, et al.,
    Defendants.

No. 3:18-cv-503 (SRU)

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE

FloodBreak, LLC ("FloodBreak") filed the instant patent infringement action against Art Metal Industries, LLC ("AMI") and its principal owner, Kevin F. Biebel (collectively, "Defendants"). The complaint alleges that Defendants are infringing FloodBreak's United States Patent No. 9,752,324 ("the '342 patent"), entitled "Flood Protection for Underground Air Vents." FloodBreak seeks an order permanently enjoining Defendants' allegedly-infringing activities and monetary damages.

Defendants have moved for partial summary judgment of no lost profits damages, arguing that FloodBreak has failed to proffer admissible evidence demonstrating that it had the capacity to manufacture the orders that it allegedly lost to AMI. Defendants principally challenge the admissibility of a document, referred to hereinafter as the "MCD Capacity Document," which FloodBreak has offered as evidence of its manufacturing capacity. Defendants have also moved to exclude FloodBreak's expert's opinion on reasonable royalty damages, contending that the underlying analysis is unreliable.

Because evidence other than the MCD Capacity Document is sufficient to carry FloodBreak's burden, and because the document may be considered at this juncture in any event, I conclude that FloodBreak is entitled to seek lost profits and **deny** the motion for summary

judgment of no lost profits damages.  Moreover, because FloodBreak has adequately demonstrated that the damages expert's opinion is competent, relevant, and reliable, I **deny** the motion to exclude.

## I.  Standard of Review

### A.  Motion for Summary Judgment

A court shall grant summary judgment when the movant demonstrates that there is no genuine dispute with respect to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When reviewing a summary judgment motion, a court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings and instead must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In that instance, "there can be 'no genuine issue as to any material fact,' because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (holding that a movant's burden is satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim).

B. Motion to Exclude Evidence

Federal Rule of Evidence 702 requires district courts to perform a "gatekeeping role" with regard to expert evidence—that is, to evaluate the relevance and reliability of the testimony before allowing the expert to testify before a jury. *Miller v. City of New London*, 2015 WL 2179773, at *1 (D. Conn. May 8, 2015). Rule 702 establishes a two-part reliability test. *Aidoo v. Cela*, 2018 WL 6435650, at *7 (D. Conn. Dec. 7, 2018). First, the proposed expert must be "qualified as an expert by knowledge, skill, experience, training, or education." *Id.* (quoting Fed. R. Evid. 702). Second, the expert's testimony must satisfy four non-exhaustive factors: the testimony must (1) "offer scientific, technical, or specialized knowledge that will help the trier of fact determine a fact at issue;[1]" (2) "be based on sufficient facts or data;" (3) "be the product of reliable principles and methods;" and (4) "have reliably derived from the application of those principles and methods to the facts of the case." *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 202 (D. Conn. 2014), *aff'd*, 724 F. App'x 25 (2d Cir. 2018). In short, the opinion must be

---

[1] Whether the opinion offers "scientific, technical, or specialized knowledge" that will "help the trier of fact determine a fact of issue" is principally a question of relevance. *See Miller*, 2015 WL 2179773, at *2.

competent, relevant, and reliable.  *Izzarelli v. R.J. Reynolds Tobacco Company*, 806 F. Supp. 2d 516, 531 (D. Conn. 2011), *vacated in part on other grounds,* 701 F. App'x 26 (2d Cir. 2017).  Expert opinions that are "speculative or conjectural" should be excluded.  *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

The party seeking to admit the witness bears the burden of demonstrating, by a preponderance of the evidence, that its testimony is admissible.  *Izzarelli*, 806 F. Supp. 2d at 531–32.  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Therefore, a court "should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."  *Id*. (internal citations omitted).

## II.    Background

### A.    Statement of Facts[2]

FloodBreak owns the '342 patent, which issued on September 5, 2017.  Doc. No. 36-1 ('342 patent).  According to the declaration of FloodBreak's President, Louis Waters, FloodBreak has manufactured and sold mechanical closure devices ("MCDs") covered by the '342 patent for use in ventilation shafts in the New York City subway system since at least August 2015.  *See* Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 170, at ¶ 28.  Those MCDs have been supplied in connection with six contracts for flood prevention work issued by the New York City Metropolitan Transit Authority ("MTA").  *Id*. at ¶ 28.  FloodBreak bid on two other MTA contracts, but lost those to Defendants.  *Id*.

---

[2] The facts are primarily drawn from the parties' Local Rule 56(a)1 and Local Rule 56(a)2 Statements of Fact.  Unless otherwise indicated, the facts are not disputed.

1. *MCD Manufacturing*

    a.  Waters' Declaration[3]

In his declaration, Waters explained that, around May 2013, the MTA contacted FloodBreak seeking solutions to problems that arose during Hurricane Sandy.  Doc. No. 171, at ¶ 5.  In response, FloodBreak offered its MCDs as a possible solution.  *Id*.  In late 2014, as the MTA was deciding whether to select FloodBreak's solution, it inquired about FloodBreak's capacity to produce the MCDs.  *Id*. at ¶ 5.

    FloodBreak had originally contracted with Springer & Springer ("Springer"), a third party, to manufacture FloodBreak's MCDs.  *Id*. at ¶ 6.  FloodBreak received a commitment from Springer to produce up to thirty MCDs per week in September 2014.[4]  *Id*.  Following the MTA's inquiry, Waters began working with Nick Eastman, FloodBreak's Director of Operations, to develop additional production capacity to ensure that FloodBreak would be able to meet the MTA's demand.  *Id*.

    Toward that end, between 2014 and 2017, Waters and Eastman met with and evaluated several other manufacturers:  Scientific Machine & Welding ("SMW"), Athena Manufacturing ("Athena"), and Cortec Precision Manufacturing ("Cortec").  *Id*. at ¶ 7.  As part of that evaluation, Waters and Eastman "provided the manufacturers with schematics for the MCDs and requested quotes; performed site inspections to ascertain each manufacturer's capabilities and suitability; ordered and examined full-scale prototype units to ensure that each manufacturer

---

[3] The facts in this subsection are drawn from the declaration.  In his declaration, Waters affirmed that he has "personal knowledge of the matters set forth in th[e] declaration and, if called upon as a witness, [he] could completely testify to the truth of each statement in th[e] declaration."  Doc. No. 171, at ¶ 1.

[4] Springer began production of MCDs for FloodBreak in connection with MTA projects in July 2015.  Doc. No. 171, at ¶ 6.

could produce MCDs that met FloodBreak's specifications; and requested production commitments." *Id*.

Between Springer, SMW, Athena, and Cortec, FloodBreak developed the capacity to produce as many as seventy MCDs per week, as elaborated below. *Id*. at ¶ 11

### i. SMW

FloodBreak first met with SMW in October 2014. *Id*. at ¶ 8. It conducted its first site inspection of SMW in January 2015 and its first inspection of a sample MCD in April 2016. *Id*. SMW started producing MCDs for FloodBreak in October 2016, with a "committed production capacity" of up to twenty MCDs a week. *Id*.

### ii. Athena

FloodBreak had its first meeting with Athena in February 2017. *Id*. at ¶ 9. It conducted its first site inspection of Athena in March 2017 and its first inspection of a sample MCD from Athena in August 2017. *Id*. Athena started producing MCDs for FloodBreak by September 2017, with a "committed production capacity" of up to ten MCDs a week. *Id*.

### iii. Cortec

FloodBreak had its first meeting with, and conducted its first site inspection of, Cortec in February 2017. *Id*. at ¶ 10. It conducted its first inspection of a sample MCD from Cortec in November 2017. *Id*. Although Cortec committed to produce up to ten MCDs a week, FloodBreak has yet to use Cortec for MCD production. *Id*.

### iv. Actual Production

Waters noted that FloodBreak's actual MCD production rates have never approached or exceeded its MCD production capacity. *Id*. at ¶ 12. FloodBreak has largely relied on Springer

and SMW to manufacture its MCDs; it has used Athena for only a limited number of MCDs.  *Id.* at ¶ 13.  According to Waters, the MCD production capacity supplied by Springer and SMW "far exceeds" FloodBreak's actual needs, and FloodBreak would have been able to fulfil Defendants' orders on top of its own using just those two manufacturers.  *Id.* at ¶ 13.

> b.   MCD Capacity Document (Doc. No. 130-4)

During his deposition, Waters, FloodBreak's 30(b)(6) designee, was questioned about the MCD Capacity Document.  Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 139, at ¶ 12; *see also* Doc. No. 130-4 (MCD Capacity Document).  The single-page document consists of a four-row chart, with numbers filled in next to rows with the names of the above four manufacturers and under one column titled "rate/week" and six columns titled 2014 through 2019.

The document purports to show the MCD production capacity for each of the four manufacturers.  Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 139, at ¶ 10.  It does not on its face indicate when it was created, who authored it, or what its source is.  Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 139, at ¶ 10.

At the deposition, Waters characterized the document as an "early capacity planning document."  Defs. Local Rule 56(a)1 Statement of Facts, Doc. No. 139, at ¶ 13.  He testified that he thought his employee, Eastman, authored the document but was "not 100 percent sure."  *Id.* at ¶ 15.  He stated that did not know when the document was created.  Doc. No. 130-5, at 338:23–24.

As set forth in his declaration, Waters investigated the MCD Capacity Document following the deposition and confirmed that the document was created by Eastman.  *See* Doc. No. 171, at ¶ 17.  Waters elaborated that Eastman prepared the document "based on the

evaluations of Springer, SMW, Athena, and Cortec that Mr. Eastman and [Waters] conducted

between 2014 and 2017 and on the meetings and negotiations that [they] have had with those

manufacturers as part of FloodBreak's MCD capacity planning." *Id*.  He affirmed that the

numbers presented in the MCD Capacity Document are accurate based on his "personal

knowledge of FloodBreak's MCD production capacity planning." *Id*. at ¶ 16.

### 2. *FloodBreak's Damages Expert's Report*

FloodBreak contends that it is entitled to damages based on alleged lost profits.  Defs.

Local Rule 56(a)1 Statement of Facts, Doc. No. 139, at ¶ 2.  It specifically alleges that, but for

Defendants' infringing sales, FloodBreak would have sold its own MCDs to Defendants'

customers in the same quantities that Defendants sold.  *Id*. at ¶ 7.

In support of its damages theory, FloodBreak has introduced a report prepared by its

expert witness, Dr. Christine Meyer.  Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 170, at

¶ 47; Doc. No. 130-1 (Dr. Meyer's Report).  In that report, Dr. Meyer opined on (a) lost profits

from sales FloodBreak did not make because of Defendants; (b) damages from the erosion of

FloodBreak's MCD prices due to Defendants' presence in the market; and (c) a reasonable

royalty for Defendants' use of the invention.  *See* Doc. No. 130-1, at ¶¶ 66–89.

### a. Dr. Meyer's Opinion re: Lost Profits

Dr. Meyer concluded that FloodBreak's total damages from lost profits due to lost sales

and price erosion amount to $19.3 million.  *Id*. at ¶ 11.  She specifically opined that lost profits

due to lost sales equal $8.2 million and that FloodBreak's damages due to price erosion equal

$11.1 million.  *Id*. at ¶¶ 69, 70, 86.

To determine lost profits from lost sales, Dr. Meyer walked through the four-factor test

articulated in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).

*Id*. at ¶¶ 42–69.  With respect to the third *Panduit* factor now at issue—marketing and

manufacturing ability to meet demand for the infringing products—she opined that FloodBreak

had the capacity to manufacture all of AMI's allegedly infringing sales.  *Id*. at ¶ 56.

As Dr. Meyer explained in the report, "the maximum number of MCDs that FloodBreak

produced per quarter was 245 in 2018Q2" and "FloodBreak's MCD production never

approached or exceeded production capacity, which was 390 per quarter (30 per week) in 2015,

and by 2017 capacity had ramped up to 650 per quarter (50 per week)."  *Id*. at ¶ 56.  She

concluded, "if FloodBreak had added to its actual production the sales that AMI had contracted

to provide, the number of MCDs that FloodBreak would have needed to produce would not have

exceeded the capacity of its suppliers."  *Id*.

Dr. Meyer also noted that Waters testified that FloodBreak "never hit capacity

constraints" and had "managed capacity in such a way as to be able to ramp up as needed."  *Id*. at

¶ 57.  She added that, during her interview with him, Waters remarked that SMW "had additional

real estate such that it would be easy for it to build more space to add capacity if needed," but

that it "had never done so since capacity was not a limiting factor."  *Id*.

Dr. Meyer cited to the MCD Capacity Document and Waters' testimony as support for

FloodBreak's production capacity.  She testified in her deposition that she confirmed the

information in those documents during her interview with Waters.  *See* Doc. No. 130-6, at

146:23–147:7.

b.   Dr. Meyer's Opinion re: Reasonable Royalty

In her report, Dr. Meyer additionally opined that, "[t]o the extent that a finder of fact

were to determine that a reasonable royalty is the appropriate measure of damages in this matter,

the only reasonable royalty sufficient to compensate FloodBreak, the patent holder, is equal to at

least the amount of its total lost profits, including lost profits on lost sales and price erosion."

Doc. No. 130-1, at ¶ 12.  In calculating the reasonable royalty, she explored how a negotiation

would have transpired and walked through the *Georgia-Pacific* factors.[5]  *Id*. at ¶¶ 87–88.  She

weighed how FloodBreak had never granted a license for the '342 patent and opined that "[t]he

hypothetical license at issue would be a non-exclusive license for the contracts at issue in this

matter through the end of the contracts."  *Id*. at ¶ 88.  She noted that:

> [i]f AMI is found to have infringed the patent, then I understand that the
> infringer will have made full use of the patented invention, the patented
> invention drove AMI's sales of MCDs, and the invention was critical to
> AMI's sales and profitability, since, without it, AMI would not have been
> able to satisfy the MTA's "approved equal" requirement.

*Id*.

She further discussed how the patented invention contains "several key advantages over

prior flood control devices," and how it is "specifically required by the MTA," which has led to

"millions of dollars in sales and profits for FloodBreak and AMI."  *Id*.  According to Dr. Meyer,

those profits "include profits on MCDs and ancillary products typically sold with MCDs such as

warranties, ladders, stands, and tools."  *Id*.  She determined that, "[a]ll of these factors would

tend to indicate a substantial royalty in the hypothetical negotiation."  *Id*. at ¶ 88.

Dr. Meyer added that "the most important factors in the negotiation would have been

Georgia-Pacific factors 5 and 15."[6]  *Id*.  She explained, "[i]n a hypothetical license, FloodBreak,

---

[5] As I explain below, the "hypothetical negotiation" approach—also called the "willing licensor-willing licensee" approach—attempts to "ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009).  The Federal Circuit has applied factors identified in *Georgia-Pacific v. US Plywood Corporation*, 318 F. Supp. 1116 (S.D.N.Y. May 28, 1970), to ascertain a reasonable royalty through a hypothetical negotiation.  *See id.* at 1324–25.

[6] Factor 5 is "[t]he commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter."  *Georgia-Pacific*, 318 F. Supp. at 1120.

Factor 15 is "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain

which spent considerable resources developing a critical flood protection product, would have been required to grant a license to its only competitor." *Id*. And "[a]s a 'prudent patent owner' and a rational economic licensor, understanding that such a license would lead to substantial lost sales, lost convoyed sales, and price erosion as a result of licensing to a direct competitor for the exact same contract opportunities, the only reasonable royalty that FloodBreak would have been willing to accept was in the amount of its total lost profits from lost sales and price erosion, amounting to a royalty of at least $19.3 million." *Id*. The opinion concluded, "[t]his is likely an underestimate of the reasonable royalty, because it does not include lost profits from ancillary, convoyed sales (other than warranties), likely understates the lost profits from lost warranties as discussed above, [and] because cost savings from economies of scale that may have been realized had FloodBreak produced additional units." *Id*.

B. Procedural History

FloodBreak filed the instant suit on March 26, 2018. *See* Compl., Doc. No. 1. As asserted in its complaint, FloodBreak alleges that Defendants infringed, and continue to infringe, multiple claims of the '342 patent by making, using, offering to sell, and selling MCDs covered by the '342 patent. *Id*. at ¶¶ 21–22. The complaint specifically alleges that AMI is directly infringing the patent and that, because AMI is the alter ego of Biebel, Biebel is also directly infringing the '342 patent. *Id*. The complaint further alleges that both Biebel and AMI are inducing infringement of the '342 patent, and that their infringement is willful. *Id*. at ¶¶ 23–26. FloodBreak seeks an order permanently enjoining Defendants' allegedly-infringing activities as well as monetary damages. *Id*. at 7.

---

a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." *Id*.

Defendants answered the complaint on May 11, 2018, and on February 12, 2020, filed a motion for partial summary judgment of no lost profits damages (doc. no. 130) and a motion to exclude the testimony of Dr. Meyer regarding a reasonable royalty (doc. no. 135).  Oral argument was held on June 11, 2020 on all pending motions.[7]

## III.   Discussion

### A.   Motion for Partial Summary Judgment of No Lost Profits Damages (Doc. Nos. 130, 160)

1.   *FloodBreak Has Adduced Sufficient Admissible Evidence to Establish its Entitlement to Seek Lost Profits.*

Defendants move for partial summary judgment of no lost profits damages, arguing that FloodBreak has failed to put forth admissible evidence to support how lost profits are warranted as damages.  I disagree.

A prevailing patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  "Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty [it] would have received through arms-length bargaining."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

To recover lost profits as damages, "a patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer."  *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 971 (Fed. Cir. 2000).  One way for a patentee to prove its entitlement to lost profits is to satisfy the four-factor test pronounced in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).   Under that

---

[7] Defendants have filed three other motions:  (1) a motion for summary judgment based on a patent license (doc. no. 60); (2) a motion for summary judgment of non-infringement and invalidity (doc. no. 147); and (3) a motion for summary judgment of no direct or indirect infringement by Biebel and no willful infringement by Defendants (doc. no. 142).  I address those in separate opinions.

test, a patentee must establish:  "(1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made."  *Tate Access Floors, Inc.*, 222 F.3d at 971 (internal citations and quotation marks omitted).  The patentee bears the burden of proving damages.  *Lucent Techs., Inc*, 580 F.3d at 1324.

The availability of lost profits is a question of law.  *Weschler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007).  "Only after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits."  *Id.*

Here, Defendants argue that FloodBreak cannot prove that lost profits damages are warranted because it has failed to proffer admissible evidence that its third-party manufacturers had the capacity to produce MCDs beyond those sold by FloodBreak and, therefore, has not carried its burden of proof on the third element of the *Panduit* test.  *See* Mem. in Supp. of Mot. for Summ. J., Doc. No. 138, at 1.  Defendants specifically take issue with the MCD Capacity Document, which FloodBreak has offered as evidence of its manufacturing capacity, claiming that the document is (a) not properly authenticated, (b) speculative, and (c) hearsay.  Reply, Doc. No. 185, at 3, 6–8.

Because other evidence that FloodBreak has introduced is sufficient to carry its burden and because, at any rate, the MCD Capacity Document can be considered at this stage, those arguments are without merit.

a. There Is Ample Admissible Evidence Aside from the MCD Capacity Document that Shows FloodBreak Had Enough Manufacturing Capacity to Meet the Demand for MCDs.

At the start, I conclude that Defendants' challenge to the MCD Capacity Document is unavailing because other record evidence—including Dr. Meyer's expert report and Waters' declaration—adequately establishes that FloodBreak had sufficient manufacturing capacity.

In Dr. Meyer's report, she opined that, "if FloodBreak had added to its actual production the sales that AMI had contracted to provide, the number of MCDs that FloodBreak would have needed to produce would not have exceeded the capacity of its suppliers." Doc. No. 130-1, at ¶ 56. As is evident from the report, Dr. Meyer rested that opinion on: (a) FloodBreak's MCD production capacity; (b) the maximum number of MCDs that FloodBreak had produced; (c) the sales that AMI had contracted to provide; (d) Waters' testimony that FloodBreak "never hit capacity constraints and had managed capacity in such a way as to be able to ramp up as needed;" and (e) Waters' statements during his interview that FloodBreak's manufacturer "had additional real estate such that it would be easy for it to build more space to add capacity if needed." *Id.* at ¶¶ 55–57. Defendants have not challenged the admissibility of that expert lost profits opinion.

Moreover, in his declaration, Waters affirmed that FloodBreak lost two MTA contracts to Defendants; that FloodBreak developed the capacity to produce up to seventy MCDs per week; that actual production rates never approached or exceeded its capacity; and that FloodBreak would have had the production capacity to fulfill Defendants' orders on top of its own with just two of its manufacturers. *See* Doc. No. 171, at ¶¶ 3, 11–13. And as FloodBreak notes in its brief, FloodBreak intends to offer Waters' testimony at trial as evidence that it had the capacity to make Defendants' allegedly infringing sales. Opp. to Mot. for Summ. J., Doc. No. 169, at 1.

14

The Federal Circuit has held similar evidence to be sufficient to prove that a patentee had enough manufacturing capacity to exploit demand for an infringing product. *See, e.g., TEK Global, S.R.L. v. Sealant Systems Int'l Inc.*, 920 F.3d 777, 790–91 (Fed. Cir. 2019) (upholding jury's lost profits award based on infringing sales to a customer and rejecting the argument that the patent owner, TEK, failed to prove the third *Panduit* factor when (a) the inventor testified that TEK lost business to the infringing defendant, (b) the damages expert testified that TEK had the capacity to make the sales that the infringing defendant made, and (c) TEK's managing director testified that TEK had been providing the customer with 100% of its North America product before the infringing defendant entered the marketplace).

Defendants seem to argue that Dr. Meyer's opinion cannot be considered in deciding the instant motion because it relies on the MCD Capacity Document, which they contend is inadmissible. Even if that document is inadmissible, however, "inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial." *Parks v. Blanchette*, 144 F. Supp. 3d 282, 293 (D. Conn. 2015) (internal citations omitted). And as I explain below, information presented in the MCD Capacity Document could be admissible at trial in the form of Waters' testimony.

Defendants' argument also fails under Federal Rule of Evidence 703, which reads as follows:

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. *If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.* But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis added).  Accordingly, under Rule 703, "experts can testify to

opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably

rely on such evidence in forming their opinions.'"  *United States v. Mejia*, 545 F.3d 179, 197 (2d

Cir. 2008) (internal citations omitted); *see also Wasilewski v. Abel Womack, Inc*, 2016 WL

183471, at *9 (D. Conn. Jan. 14, 2016) ("Federal Rule of Evidence 703 enables experts to base

. . . an opinion on inadmissible evidence so long as 'experts in the particular field would

reasonably rely on those kinds of facts or data in forming an opinion on the subject.'").

In this case, Defendants offer no persuasive explanation why it was unreasonable of Dr.

Meyer to rely on the MCD Capacity Document supplied by FloodBreak in determining

FloodBreak's production capacity.  A document received from a client that purports to show the

production capacity of its manufacturers—regardless of whether that document reflects the

projected or actual production capacity—would certainly constitute "a normal source of

information for an expert" who is attempting to calculate that very capacity.  *United States v.

Mulder*, 273 F.3d 91, 102 (2d Cir. 2001).

Defendants also contend that Waters' declaration is inadmissible as hearsay because it is

not based on "first-hand knowledge about the specific manufacturing capacity of any specific

third-party manufacturer," but rather rests on "information he learned at some undetermined time

from third party manufacturers."  Reply, Doc. No. 185, at 5–6.  They similarly argue that Waters

has not pointed to any "actual and direct evidence" to demonstrate the level of FloodBreak's

manufacturing capacity.  *Id*. at 8.

Defendants' arguments miss the mark.  The relevant question governing admissibility is

not whether Waters had first-hand knowledge, but whether he had "personal knowledge."  *U.S.

Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 2006 WL 2136249, at *11

(S.D.N.Y. Aug. 1, 2006) (rejecting argument that various exhibits and testimony were based on hearsay when the testimony rested on personal knowledge).  As the Southern District of New York explained in *U.S. Information Systems*, personal knowledge "is not so narrowly defined" so as to exclude knowledge acquired through others.  *Id.*  "Although first-hand observation is obviously the most common form of personal knowledge, that is not the only basis for it."  *Id.* (internal citations omitted).

Waters' declaration establishes that he was intimately familiar with—and had personal knowledge of—FloodBreak's manufacturing process.  In the declaration, Waters explains how FloodBreak contracts all of its manufacturing work to third-party manufacturers and details the steps FloodBreak took to build its MCD production capacity.  In particular, he discusses how FloodBreak initially contracted with Springer—who had handled the majority of FloodBreak's manufacturing needs—to manufacture FloodBreak's MCDs, explaining that FloodBreak received a commitment from Springer in September 2014 to produce up to thirty MCDs a week and that Springer began production of MCDs in July 2015.  Doc. No. 171, at ¶ 6.  Following the MTA's inquiry into FloodBreak's MCD production capacity, Waters began working with Eastman "to evaluate and develop additional production capacity" to make sure that FloodBreak could meet the MTA's demand and expectations.  *See id.*  After the MTA opened bidding on projects requiring MCDs, Waters continued to work with Eastman "to develop FloodBreak's MCD production capacity."  *Id.*

The declaration further provides that, as part of that capacity planning process, Waters and Eastman conducted evaluations of, and had meetings with, additional manufacturers between 2014 and 2017.  *Id.* at ¶ 7.  They "provided the manufacturers with schematics for the MCDs and requested quotes; performed site inspections to ascertain each manufacturer's capabilities and

17

suitability; ordered and examined full-scale prototype units to ensure that each manufacturer could produce MCDs that met FloodBreak's specifications; and requested production commitments." *Id*.

Waters affirms in the declaration that he has "personal knowledge" of all the matters described above. *Id*. at ¶ 1. He further states that he has served as President of FloodBreak since its founding in 2001, and that he is ultimately responsible for ensuring that FloodBreak "engages manufacturers that can make products that meet FloodBreak's specifications and that have sufficient capacity to fill FloodBreak's orders." *Id*. at ¶¶ 2, 4.

In my view, Waters could "infer from" those responsibilities and experiences that FloodBreak had the production capacity to fulfill its own MCD orders as well as Defendants' MCD orders.[8] *U.S. Info. Sys., Inc*, 2006 WL 2136249, at *12; *see also Marcus Dairy, Inc. v. Rollin Dairy Corp.*, 2008 WL 11375364, at *1–*2 (D. Conn. Sept. 24, 2008) (holding that testimony concerning the plaintiff's milk processing "business, other competitors in the industry, the nature of competition in the milk industry, and standard industry practices" was based on the declarant's personal knowledge when the declarant had served as the owner and president of a dairy distributor for 28 years). For that reason, Defendants' argument that Waters' proposed testimony is "pure speculation" also falls short. *See United States v. Forbes*, 2006 WL 8423075, at *4 (D. Conn. Sept. 22, 2006) (concluding that testimony was not based on speculation when it was a matter of which the declarant had personal knowledge).

---

[8] Defendants further argue that "it is not clear how 'site visits' or 'evaluations' conducted in 2014 or 2017 . . . could provide knowledge of capacity of any manufacturer to make any particular number of units in late 2018 and afterwards." Reply, Doc. No. 185, at 7–8. The Federal Circuit, however, has observed that "a jury could reasonably infer manufacturing capacity from [a company's] prior activities." *TEK Glob., S.R.L.*, 920 F.3d at 790. At any rate, Waters could have also acquired personal knowledge of FloodBreak's manufacturing capacity in recent years from his position as the company's president and from his responsibility to ensure that manufacturers can fill orders. *See Marcus Dairy, Inc.*, 2008 WL 11375364, at *1–*2.

In sum, Waters' testimony and Dr. Meyer's expert report can be considered at this juncture, and both establish that FloodBreak had the manufacturing capability to exploit demand for AMI's MCDs.  Whether the MCD Capacity Document can be considered as well is therefore of no moment.

> a. Regardless, the MCD Capacity Document, Although Hearsay, May Be Considered as Evidence of FloodBreak's Manufacturing Capacity Because It Has Been Authenticated, Is Not Fatally Speculative, and Its Contents Would Otherwise Be Admissible.

Even if Waters' testimony and Dr. Meyer's expert report were not enough to carry FloodBreak's burden on the third *Panduit* factor, the MCD Capacity Document can nonetheless be considered at this stage because (a) it is properly authenticated, (b) it is not fatally speculative, and (c) although it is hearsay, the contents of the document would otherwise be admissible at trial.

> i. <u>The MCD Capacity Document Is Properly Authenticated and Not Fatally Speculative.</u>

"The documents submitted in opposition to a summary judgment motion must be properly authenticated in order to be considered by the court at summary judgment stage." *Barlow v. Connecticut*, 319 F. Supp. 2d 250, 257 (D. Conn. 2004), *aff'd sub nom. Barlow v. Dep't of Pub. Health, Connecticut*, 148 F. App'x 31 (2d Cir. 2005).  "It is irrelevant that the documents can be properly authenticated if introduced at trial through a witness, if they have not been properly authenticated when submitted in support or opposition to summary judgment." *Id.*

Under Federal Rule of Evidence 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a); *Schaghticoke*

*Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 395 (D. Conn. 2008), *aff'd*, 587 F.3d 132 (2d

Cir. 2009) ("The principles governing admissibility of evidence do not change on a motion for

summary judgment.") (citation omitted).

As a general matter, "a document is properly authenticated if a reasonable juror could

find in favor of authenticity." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007).

"The bar for authentication of evidence is not particularly high," *id.*, and "the proponent need not

rule out all possibilities inconsistent with authenticity," *United States v. Oreckinto*, 234 F. Supp.

3d 360, 365 (D. Conn. 2017) (citation omitted).  Rule 901 provides a list of examples

of evidence that satisfy the rule's requirement and includes among them "[t]estimony that an

item is what it is claimed to be."  Fed. R. Evid. 901(b)(1).

To the extent Defendants claim that FloodBreak has not authenticated the MCD Capacity

Document, I find that argument unpersuasive.  To be sure, as Defendants note, it is not clear

from the face of the document who authored the document or what the source of the information

is, and Waters could not corroborate those details during his deposition.  But that is irrelevant,

because Waters' declaration ultimately authenticates the document.

As Waters states in the declaration, the MCD Capacity Document is a "production

capacity document for the MCDs that was created by Nick Eastman" and "provides a breakdown

of FloodBreak's MCD production capacity" of the third-party manufacturers.  Doc. No. 171, at ¶

14.  Waters confirms that Eastman "prepared the MCD Capacity Document based on the

evaluations of Springer, SMW, Athena, and Cortec that Mr. Eastman and [Waters] conducted

between 2014 and 2017 and on the meetings and negotiations that [they] have had with those

manufacturers as part of FloodBreak's MCD capacity planning."  *Id.* at ¶ 17.  He confirms,

further, that the numbers listed were "accurate based on [his] personal knowledge of FloodBreak's MCD production capacity planning." *Id*. at ¶ 16.

Accordingly, FloodBreak has sufficiently established that Waters' declaration constitutes "testimony of a witness with knowledge" that the MCD Capacity Document accurately reflects the ability of four manufacturers to produce FloodBreak's MCDs. *See Commercial Data Servers, Inc. v. Int'l Bus. Machines Corp.*, 262 F. Supp. 2d 50, 58 (S.D.N.Y. 2003); *Gagliardi*, 506 F.3d at 151 (concluding that, in light of the informant's and FBI agent's testimony that several exhibits were accurate records of conversations between them and the defendant, a juror could reasonably have found that the exhibits did, in fact, represent their conversations). I therefore conclude that FloodBreak has adduced sufficient proof for a reasonable juror to find in favor of the document's authenticity.

Defendants also argue that the portion of Waters' declaration relating to the MCD Capacity Document should be stricken because it constitutes an improper "attempt to correct the testimony" that he gave during FloodBreak's 30(b)(6) deposition and thereby contravenes "the sham-affidavit rule." Reply, Doc. No. 185, at 4–5. Under the sham-affidavit rule, "a party's factual assertion in an affidavit opposing summary judgment, contradicting his prior deposition testimony, may be disregarded as a sham attempt to create an issue of fact." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 481 (2d Cir. 2014); *Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir.), *amended*, 169 F.3d 782 (2d Cir. 1998) ("We have indeed held that a party may not create an issue of fact precluding summary judgment by offering an affidavit that *contradicts* his earlier sworn testimony in the case.") (emphasis in original). For the rule to apply, the contradiction

must "be real, unequivocal, and inescapable." *See Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F. 3d 11, 22–23 (2d Cir. 2014).

Defendants have not persuasively shown how Waters' declaration contradicts his prior testimony. At the deposition, Waters stated that the document is an "early capacity planning document that I think Nick Eastman created." Doc. No. 130-5, at 338:16–17. His declaration confirms just that: that the MCD Capacity Document reflects production capacity and was created by Eastman. Moreover, according to FloodBreak, Waters was not asked during the deposition whether the numbers in the MCD Capacity Document were accurate or any questions about FloodBreak's MCD production capacity in general. Pl. Local Rule 56(a)2 Statement of Facts, Doc. No. 170, at ¶ 45.

In light of the foregoing, I conclude that Waters' declaration does not contradict his deposition testimony and that the portion of Waters' declaration that relates to the MCD Capacity Document should not be stricken. *See Langman Fabrics,* 160 F.3d at 112 (declining to disregard testimony that was "far more detailed" than the initial testimony because the additional details were "not inconsistent with [the] first, brief account").

Defendants additionally argue that the MCD Capacity Document is "speculative" because it remains unclear how the manufacturing capacity numbers were calculated. *See* Reply, Doc. No. 185, at 7–8. But that argument challenges the document's reliability and therefore is an issue for the jury. *United States v. Oreckinto*, 234 F. Supp. 3d 360, 365 (D. Conn. 2017) ("[O]nce an item of evidence is 'authenticated' as required under Rule 901, this 'merely renders evidence admissible, leaving the issue of its ultimate reliability to the jury,' for which 'the opposing party remains free to challenge the reliability of the evidence, to minimize its

22

importance, or to argue alternative interpretations of its meaning,' with all such challenges going to the weight of the evidence rather than its initial admissibility.") (internal citations omitted).

For those reasons, I find no merit in Defendants' arguments that the MCD Capacity Document is not authenticated and speculative.

> i. Even if the MCD Capacity Document Is Hearsay, It May Still Be Considered Because Its Contents Are Admissible.

Defendants stand on firmer grounds in arguing that the MCD Capacity Document is hearsay. "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "To be admissible, therefore, alleged hearsay evidence must be defined as non-hearsay or fall within one of the accepted exceptions to the general exclusionary rule." *Steinberg v. Obstetrics-Gynecological & Infertility Grp., P.C.,* 260 F. Supp. 2d 492, 495 (D. Conn. 2003).

I need not decide whether the document constitutes hearsay, because even if it is inadmissible, "inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial." *Parks v. Blanchette*, 144 F. Supp. 3d 282, 293 (D. Conn. 2015) (internal citations omitted); *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) ("Hearsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial."); *cf. Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir. 1985) (noting that a plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial").

Here, Waters confirms in his declaration that the numbers in the MCD Capacity Document are "accurate based on [his] personal knowledge of FloodBreak's MCD production capacity planning." Doc. No. 171, at ¶ 16. In addition, Waters affirms that "if called upon as a witness, [he] could competently testify to the truth of each statement in th[e] declaration." *Id*. at ¶ 1. Because information presented in the MCD Capacity Document could be admissible at trial in the form of Waters' testimony, the document may be considered in deciding this motion.

Taking the MCD Capacity Document into account, my conclusion that FloodBreak has sufficiently established that it had the manufacturing ability to fully exploit demand for the MCDs is further supported. Dr. Meyer relied on the MCD Capacity Document to calculate the number of MCDs that FloodBreak's manufacturers could produce, and that calculation informed her conclusion that FloodBreak's manufacturing capacity could have satisfied both FloodBreak's and AMI's sales. *See* Doc. No. 130-1, at ¶¶ 55–56.

For the foregoing reasons, lost profits damages are available as a matter of law. Because FloodBreak has satisfied the third—and only disputed—*Panduit* factor, it is entitled to pursue a lost profits theory at trial. I therefore **deny** Defendants' motion for partial summary judgment of no lost profits damages.

B.  <u>Motion to Preclude Dr. Meyer's Opinion re: Reasonable Royalty (Doc. Nos. 135, 157)</u>

Defendants have also moved to preclude the opinion and testimony of Dr. Meyer regarding a reasonable royalty under Rule 702 and *Daubert*.[9]  *See* Doc. Nos. 135, 157. As I discuss below, FloodBreak has sufficiently established that Dr. Meyer's opinion is competent and reliable, and I will therefore allow it into evidence.

---

[9] The motion concerns only Dr. Meyer's reasonable royalty opinion; it does not challenge her opinion on lost profits.

24

1.   *Reasonable Royalty Damages under 35 U.S.C. § 284*

As I noted earlier, a prevailing patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  To obtain lost profits as damages, a patent owner must show that "but for the infringement, it would have made the infringer' sales."  *State Indus., Inc. v. Mor-Flo Indus., Inc*., 883 F.2d 1573, 1577 (Fed. Cir. 1989).

"[T]he floor for a damage award is no less than a reasonable royalty."  *Id*.  "The determination of a reasonable royalty . . . is based not on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would have agreed at the time the infringement began."  *Radio Steel & Mfg. Co. v. MTD Prods., Inc*., 788 F.2d 1554, 1557 (Fed. Cir. 1986).

The hypothetical negotiation approach, or the "willing licensor-licensee" approach, is the more common method of determining a reasonable royalty.  *See Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1324 (Fed. Cir. 2009).  The approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began."  *Id*.  "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement."  *Id*. at 1325.  That is, "if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme."  *Id*.

The Federal Circuit has applied the non-exhaustive factors outlined in *Georgia-Pacific* to ascertain a reasonable royalty through a hypothetical negotiation.[10]  *Id.* at 1324–35; *Uniloc USA,*

---

[10] The fifteen factors identified in *Georgia-Pacific* are:  (1) "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty;" (2) "The rates paid by the licensee for the use of other patents comparable to the patent in suit;" (3) "The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;" (4) "The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;" (5) "The commercial relationship between the licensor and licensee, such as, whether they are

*Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("This court has sanctioned the use of the *Georgia–Pacific* factors to frame the reasonable royalty inquiry.").

2. *FloodBreak Has Carried Its Burden of Showing that Dr. Meyer's Opinion Is Competent and Reliable.*

Defendants challenge Dr. Meyer's opinion that, in the event the jury finds a reasonable royalty to be the appropriate measure of damages, the only reasonable royalty sufficient to compensate FloodBreak is one equal to FloodBreak's total lost profits from lost sales and price erosion, which amount to $19.3 million.  They propound the following arguments in support, some of which overlap:  (1) the opinion is not premised on an analysis of a hypothetical negotiation between a willing licensee and willing licensor, but rather reflects an attempt to "backdoor [Dr. Meyer's] lost profits opinion into the case in the event the jury finds that FloodBreak is unable to meet the Federal Circuit's stringent requirements to establish lost profits;" (2) Dr. Meyer's discussion of the *Georgia-Pacific* factors is conclusory; (3) Dr. Meyer failed to consider the position of a willing licensee; (4) Dr. Meyer improperly considered price

---

competitors in the same territory in the same line of business; or whether they are inventor and promoter;" (6) "The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales;" (7) "The duration of the patent and the term of the license;" (8) "The established profitability of the product made under the patent; its commercial success; and its current popularity;" (9) "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;" (10) "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention;" (11) "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use;" (12) "The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;" (13) "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;" (14) "The opinion testimony of qualified experts;" and (15)" The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." *Georgia-Pac. Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.,* 446 F.2d 295 (2d Cir. 1971).

erosion; (5) Dr. Meyer did not identify the date of the hypothetical negotiation; and (6) Dr. Meyer failed to offer an opinion on the form of the reasonable royalty.  Mem. in Supp. of Mot. for Summ. J., Doc. No. 136, at 6, 8–11; Reply, Doc. No. 182, at 7.  I address each argument in turn.[11]

> a.   Defendants' Argument that Dr. Meyer's Analysis is Grounded Solely on Lost Profits Is Without Merit.

Defendants first argue that Dr. Meyer's opinion is inadmissible because she does not conduct a meaningful analysis of a hypothetical negotiation between a willing licensee and willing licensor, and instead impermissibly "couches her opinion on reasonable royalty damages as simply being equal to the lost profits damages."  Mem. in Supp. of Mot. for Summ. J., Doc. No. 136, at 7.

That argument is belied by the record.  The report reflects that Dr. Meyer, in calculating a reasonable royalty, comprehensively applied the *Georgia-Pacific* framework to the facts of the case.  In examining how a "hypothetical negotiation" would have proceeded, she considered that: (1) FloodBreak had never granted a license for its '342 patent;[12] (2) the invention "drove" AMI's sales of MCDs and was "critical" to AMI's sales and profitability because, "without it, AMI would not have been able to satisfy the MTA's 'approved equal' requirement;"[13] (3) the patented invention was "specifically required by the MTA," which had led to "millions of dollars in sales

---

[11] Defendants focus their argument on the reliability of Dr. Meyer's opinion and do not dispute its relevance.  I briefly note, however, that Dr. Meyer's opinion regarding a reasonable royalty is indeed relevant.  Evidence is relevant if it tends to "make the existence of a fact that is of consequence in determining the action more probable or less probable." *Miller v. City of New London*, 2015 WL 2179773, at *2 (D. Conn. May 8, 2015) (citing Fed. R. Evid. 401).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citing *Daubert*, 509 U.S. at 591).  Here, because the reasonable royalty amount is instructive on the issue of damages, Dr. Meyer's expert opinion regarding the royalty is relevant. *See* 35 U.S.C. § 284 ("The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.").

[12] The report noted that this is relevant to *Georgia-Pacific* factors 1 and 4.

[13] The report noted that this is relevant to *Georgia-Pacific* factors 10, 11, and 13.

and profits for FloodBreak and AMI;"[14] (4) those profits included profits on MCDs and ancillary products customarily sold with MCDs, such as warranties and ladders;[15] and (5) the patented invention had "several key advantages" over previous flood control devices.[16]  Doc. No. 130-1, at ¶¶ 87–88.  She opined that the hypothetical license would be a non-exclusive license for the contracts at issue through the end of those contracts,[17] and noted that "[a]ll of these factors would tend to indicate a substantial royalty in the hypothetical negotiation."  *Id.* at ¶ 88.

Dr. Meyer noted further that "the most important factors" in the hypothetical negotiation would have been *Georgia-Pacific* factors 5 and 15.  *Id.*  She elaborated, "[i]n a hypothetical license, FloodBreak, which spent considerable resources developing a critical flood protection product, would have been required to grant a license to its only competitor."  *Id.*  And "[a]s a 'prudent patent owner' and a rational economic licensor, understanding that such a license would lead to substantial lost sales, lost convoyed sales, and price erosion as a result of licensing to a direct competitor for the exact same contract opportunities, the only reasonable royalty that FloodBreak would have been willing to accept was in the amount of its total lost profits from lost sales and price erosion, amounting to a royalty of at least $19.3 million."  *Id*

As is clear from the report, Dr. Meyer considered the *Georgia-Pacific* factors, applied each of them to the facts of the case, and tied those facts to her reasonable royalty calculation. Her detailed analysis of the hypothetical negotiation supports FloodBreak's argument that the opinion is admissible and undercuts Defendants' claim that the opinion is cursory.[18]  *See Exmark*

---

[14] The report noted that this is relevant to *Georgia-Pacific* factor 8.
[15] The report noted that this is relevant to *Georgia-Pacific* factor 6.
[16] The report noted that this is relevant to *Georgia-Pacific* factors 9 and 10.
[17] The report noted that this is relevant to *Georgia-Pacific* factors 3 and 7.
[18] As further support for their argument that Dr. Meyer's hypothetical negotiation analysis is conclusory, Defendants contend that Dr. Meyer did not cite to any supporting documents for her statement that "[t]he patented invention is specifically required by the MTA."  Reply, Doc. No. 182, at 6.  That argument is without merit because Dr. Meyer provides support for that assertion in the report's background section.  *See* Doc. No. 135-1, at ¶ 22 (observing that, in an MTA contract, MCDs covered by the patent in issue were required).

*Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC,* 879 F.3d 1332, 1349 (Fed. Cir. 2018) ("To be admissible, expert testimony opining on a reasonable royalty must sufficiently tie the expert testimony on damages to the facts of the case.") (internal citations, alterations, and quotation marks omitted).

Accordingly, there is no indication that Dr. Meyer's opinion is the product of the "direct setting of the reasonable royalty in the amount of the licensor's lost profits," which distinguishes her opinion from the expert opinion in the *Syneron* case, on which Defendants rely.  *See Syneron Med. Ltd v. Invasix, Inc.*, 2018 U.S. Dist. LEXIS 220514, *6–13 (C.D. Cal. Aug. 27, 2018), *adopted by*, 2018 U.S. Dist LEXIS 220505 (C.D. Cal. Sept. 28, 2018).  Significantly, in *Syneron*, the damages expert "acknowledge[d] that he lacked sufficient information to conduct a lost profits analysis" and made "no attempt [to] meet the required showings to establish an entitlement to a lost profit award."  *Id.* at *6, *13.  FloodBreak, by contrast, has sufficiently shown that it is entitled to lost profits.  The argument that FloodBreak is attempting to backdoor a lost profits award through Dr. Meyer's reasonable royalty opinion is thus without merit.

To the extent Defendants argue that Dr. Meyer's analysis is legally incorrect because lost profits was a predominant consideration, that argument is foreclosed by the Federal Circuit's decision in *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352 (Fed. Cir. 2017).  There, the patentee prevailed at trial and was awarded damages in the amount of $404,941 based on a 14.5% royalty rate.  *Id.* at 1356.  The infringer appealed the damages award, raising the argument that the patentee's profit margin "predominated and virtually subsumed" the damages expert's reasonable royalty award calculation, and that the patentee thereby circumvented the lost profits damages requirement.  *Id.* at 1362–63.

The Federal Circuit upheld the award and rejected the infringer's argument, reasoning that the infringer "identifie[d] no legal principle about predominance that would somehow bar a damages analysis that takes reasonable account of all the evidence relevant to the hypothetical negotiation." *Id*. at 1363.  The court added that the expert adjusted "her hypothetical-negotiation model to account for numerous considerations other than Asetek's per-unit profits," as is the case here.  *Id*.  It further observed that "a patent owner would be unlikely to be interested in accepting a royalty rate lower than its profit margin on the patented products."  *Id.* at 1362 (internal citation and quotation marks omitted).

Accordingly, that Dr. Meyer weighed lost profits more heavily than other factors in her hypothetical negotiation analysis does not render her opinion unreliable or otherwise inadmissible.  That is particularly so considering, as Dr. Meyer did, that (a) the patented invention has led to millions of dollars in profits for FloodBreak and AMI, (b) FloodBreak had not previously licensed the '342 patent, and (c) both parties are direct competitors bidding for the same contracts.  *See Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1554–55 (Fed. Cir. 1995) (affirming calculation of reasonable royalty rate equal to 50% of estimated lost profits when (a) the patent at issue was a "pioneer" patent with clear commercial success, (b) the patent owner followed a practice of exploiting its own patents rather than licensing them to others, and (c) the patent owner would have had to forgo substantial profits by granting a license to the infringing defendant, partly because the infringer was a key competitor).

In sum, Dr. Meyer took into account "all the evidence relevant to the hypothetical negotiation" and "adjusted her hypothetical-negotiation model to account for numerous considerations."  *Asetek*, 852 F.3d at 1363.  Defendants' assertion that her opinion is nothing

more than an attempt to circumvent the evidentiary requirements of establishing lost profits is therefore without merit.

3. *Defendants' Argument that the Opinion Did Not Consider What They Would Have Willingly Paid Is Unavailing.*

Defendants also aver that Dr. Meyer's opinion is flawed because she failed to conduct "an analysis of a hypothetical negotiation between a willing licensee and willing licensor." Doc. No. 136, at 6. They contend, in other words, that Dr. Meyer failed to account for what Defendants would have been willing to pay as licensees. I disagree.

The amount that a licensee would agree to pay is one factor for courts to consider in ascertaining a reasonable royalty through a hypothetical negotiation. *Asetek Danmark A/S.*, 852 F.3d at 1363 ("A hypothetical-negotiation analysis for a royalty considers not only the patent owner's interests, but also the other side of the negotiation table under the particular conditions of the hypothetical negotiation."); *Georgia–Pacific,* 318 F. Supp. at 1120 (listing as factor 15 "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon").

As support for its argument that Dr. Meyer did not consider what Defendants would have agreed to, Defendants assert that (1) "[a]ny analysis of the actual facts at the time of the hypothetical negotiation . . . would have never resulted in an agreement by AMI to pay a reasonable royalty of $19.3 million, which . . . is more than twice AMI's revenues for the accused products [$7.7 million];" and (2) Dr. Meyer admitted at her deposition that Defendants would likely not have been willing to pay a royalty that is double its revenue. *See* Doc. No. 136, at 9 (emphasis omitted); Doc. No. 182, at 4.

Because the gravamen of the former argument is that the size of Dr. Meyer's proposed royalty award is unreasonable, it is effectively challenging Dr. Meyer's conclusion. The

accuracy of a conclusion, however, is within the province of the jury. *Summit 6*, 802 F. 3d at

1296 ("[W]here the methodology is reasonable and its data or evidence are sufficiently tied to

the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the

correctness of the methodology and of the results produced thereunder belongs to the

factfinder."). Accordingly, that argument is unavailing.

As support for the latter argument, Defendants cite to Dr. Meyer's deposition testimony

that "notwithstanding the fact that I don't disagree that AMI, Mr. Biebel would not be willing to

pay [$19.3 million in royalties], it still nevertheless is the minimum that would be adequate to

compensate FloodBreak." Doc. No. 183-1, at 217:6–218:4. That testimony, in my view, does

not reveal that Dr. Meyer did not consider Defendants' interests in reaching her reasonable

royalty sum. Rather, the cited testimony merely suggests that other considerations outweighed

any unwillingness to pay, and Defendants point to no authority for how that analysis renders her

opinion unreliable.

Indeed, the statutory requirement for patent infringement damages is not that the damages

are low enough for the infringer to make a profit, but rather that they are "adequate to

compensate for the infringement." 35 U.S.C. § 284; *Monsanto Co. v. Ralph*, 382 F.3d 1374,

1384 (Fed. Cir. 2004) ("[A]lthough an infringer's anticipated profit from use of the patented

invention is '[a]mong the factors to be considered in determining' a reasonable royalty . . . the

law does not require that an infringer be permitted to make a profit.") (citing *Georgia-Pacific*,

318 F.3d at 1120); *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1346 (Fed. Cir.

2013) ("This court has held that an infringer's net profit margin is not the ceiling by which a

reasonable royalty is capped. . . . The infringer's selling price can be raised if necessary to

accommodate a higher royalty rate, and indeed, requiring the infringer to do so may be the only

way to adequately compensate the patentee for the use of its technology.").  As the Federal

Circuit has observed, the language of the statute "does not include a royalty that a patentee who

does not wish to license its patent would find unreasonable."  *Rite-Hite*, 56 F.3d at 1555.

Here, Dr. Meyer, with good reason, determined that FloodBreak would not have been

willing to accept a royalty lower than its total lost profits, $19.3 million.  Just as Defendants

assert that they would never pay such a high royalty, FloodBreak maintains that it would not sell

for anything less.  And as the Federal Circuit has recognized, the "hypothetical negotiation

process has its limits."  *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1384 (Fed. Cir. 2004) (noting

that the "imposition on a patent owner who would not have licensed his invention for [a given]

royalty is a form of compulsory license, against the will and interest of the person wronged, in

favor of the wrongdoer"); *see also Rite–Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1554 n.13 (Fed.

Cir. 1995) ("The hypothetical negotiation is often referred to as a 'willing licensor/willing

licensee' negotiation.  However, this is an inaccurate, and even absurd, characterization when, as

here, the patentee does not wish to grant a license.").

At oral argument, Defendants also argued that Dr. Meyer's opinion was defective

because the reasonable royalty damages section did not discuss AMI's financials, business

relationships, or the MTA's contracts.  I am not persuaded, principally because Dr. Meyer

comprehensively addresses those topics in other sections of her report.  In the background

section, for instance, she discusses AMI's customers and the number of its employees.  *See* Doc.

No. 135-1, at ¶ 15.  She also details each of the MTA's contracts and subcontracts, as well as the

bidding process that preceded them.  *See id.* at ¶¶ 21–38.  In particular, she walks through the

proposals that AMI submitted to MTA's general contractors, including the quantities of MCDs it

offered to produce and at which prices.  *See, e.g.*, *id*. at ¶¶ 29, 31, 33, 35, 37.  Moreover, based

on Biebel's testimony, she estimates the number of MCDs that AMI produced in connection with the two subcontracts that it won. *See, e.g., id*. at ¶¶ 34, 36. Dr. Meyer was not required to repeat each of those facts in the reasonable royalty damages section; that she did not do so does not reflect that she failed to consider them.

For those reasons, Defendants' argument that Dr. Meyer improperly disregarded Defendants' interests or any unwillingness to pay the proposed reasonable royalty is without merit.

### 4. *Defendants' Argument that Dr. Meyer Erroneously Considered Price Erosion Is Likewise Unpersuasive.*

Defendants further assert that $11 million of Dr. Meyer's reasonable royalty sum is "based on the alleged price erosion to prices that FloodBreak charged for its own products," which they claim leads to "the indefensible proposition that AMI would pay royalties on FloodBreak's sales of FloodBreak MCDs." Mem. in Supp. of Mot. for Summ. J., Doc. No. 136, at 10. That argument is equally unavailing.

Defendants cite to no authority for the proposition that consideration of price erosion is impermissible. To the contrary, courts have recognized price erosion as a valid consideration in a hypothetical negotiation analysis. *See, e.g., EcoServices, LLC v. Certified Aviation Servs., LLC*, 2018 WL 3090013, at *4 (C.D. Cal. June 19, 2018) ("The losses [including reduced prices] Plaintiff may have suffered are relevant to the hypothetical negotiation between the parties to determine a reasonable royalty."); *02 Micro Int'l LTD. v. Beyond Innovation Tech.*, 2005 WL 6440628, at *3 (E.D. Tex. Dec. 15, 2005) ("[A]n expert may properly consider general price erosion when opining as to what constitutes a reasonable royalty for infringement.").

In their reply, Defendants advance the argument that Dr. Meyer "included wholesale, as part of a 'reasonable royalty,' the entire value of the alleged price erosion she calculated as a part

34

of her lost profits opinion."  Reply, Doc. No. 182, at 5.  But, as discussed, Dr. Meyer's opinion

was far from cursory; it considered a number of factors—only one of which was price erosion—

and tied them to the facts of the case.  For those reasons, Defendants' argument fails.

5.   *Defendants' Argument that the Opinion Is Defective Because It Does Not Specify a Date for the Negotiation Is Unconvincing.*

Defendants additionally contend that Dr. Meyer's opinion of a reasonable royalty should

be excluded because Dr. Meyer did not proffer a date for the hypothetical negotiation in her

report or during her deposition.  Mem. in Supp. of Mot. for Summ. J., Doc. No. 136, at 10.  I

disagree.

"[T]he first step in a reasonable royalty calculation is to ascertain the date on which the

hypothetical negotiation in advance of infringement would have occurred."  *Integra Lifesciences*

*I, Ltd. v. Merck KGaA,* 331 F.3d 860, 870 (Fed. Cir. 2003), *vacated on other grounds*, 545 U.S.

193 (2005).  "The correct determination of this date is essential for properly assessing damages."

*Id*.

In her report, Dr. Meyer notes that, in a hypothetical negotiation, "two willing parties . . .

are assumed to negotiate on the eve of the first infringement."  Doc. No. 130-1, at ¶ 44.

Although she could not recall the precise date at her deposition, she confirmed that she used the

date of Defendants' first infringement as the date of the hypothetical negotiation.  Doc. No. 135-

2, at 203:2–14.  The use of that date comports with Federal Circuit case law.  *See Rite-Hite*, 56 F.

3d at 1554 ("The hypothetical negotiation requires the court to envision the terms of a licensing

agreement reached as the result of a supposed meeting between the patentee and the infringer at

the time infringement began.").

Defendants cite to no authority that supports the proposition that an expert's failure to

recall the date of the first infringement renders her opinion inadmissible.  And there is no

indication that any such error was "large enough that the expert lacks 'good grounds' for [her] conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (internal citations omitted).  Rather, any error appears more akin to a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method," which "will not render an expert's opinion *per se* inadmissible."  *Id*.  Accordingly, Defendants' argument is unavailing.

> 6.  *Defendants' Argument that the Opinion Is Inadmissible Because It Does Not Specify the Form of the Reasonable Royalty Fails.*

Lastly, Defendant argue that Dr. Meyer's report should not be admitted because it does not opine on the form of the reasonable royalty, that is, whether it would be a running royalty on sales or a lump sum.  Mem. in Supp. of Mot. for Summ. J., Doc. No. 136, at 10–11.  I also find no merit in that argument.

Defendants cite to no authority for why such an omission merits exclusion and, at any rate, the record suggests that the omission was not error.  During her deposition, Dr. Meyer testified that "I think it is reasonable to assume that [the royalty] would be an ongoing royalty." Doc. No. 135-2, at 205:4–6.  She explained, however, that the form of the royalty was insignificant to the royalty calculation in this case.  *Id*. at 205:8–12 ("But [for] the purposes of determination of what the reasonable royalty would be in order to compensate the patent holder, it doesn't matter in terms of the quantum of damages whether it is a lump sum or . . . an ongoing royalty.").  According to Dr. Meyer's testimony, the quantum of damages would be the same under either form because future sales are specified in the contracts.  *See id*. at 206:17–207:19. Defendants have thus proffered no convincing argument why the failure to identify the reasonable royalty form warrants the opinion's exclusion.

At bottom, Dr. Meyer's methodology is "reasonable" and her data and evidence are "sufficiently tied to the facts of the case."  *Summit 6, LLC*, 802 F.3d at 1296.  Her opinion on a

reasonable royalty therefore passes muster under Rule 702 and *Daubert*, and I **deny** the motion to exclude it.

**IV.      Conclusion**

For the foregoing reasons, I **deny** the motion for summary judgment of no lost profits damages (doc. nos. 130, 160) and **deny** the motion to exclude the testimony of Dr. Meyer regarding a reasonable royalty (doc. nos. 135, 157).

So ordered.

Dated at Bridgeport, Connecticut, this 13th day of October 2020.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge