# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FLOODBREAK, LLC,
      Plaintiff,

No. 3:18-cv-503 (SRU)

      v.

ART METAL INDUSTRIES, LLC, et al.,
      Defendants.

## RULING AND ORDER ON APPLICATION FOR PREJUDGMENT REMEDY

This case arises out of the alleged infringement of United States Patent No. 9,752,324 ("the '342 patent"), which is directed to a flood prevention apparatus that can be installed in a ventilation shaft. As set forth in its complaint, FloodBreak, LLC ("FloodBreak"), the patent holder, alleges that Art Metal Industries, LLC ("AMI") and its principal owner, Kevin Biebel (collectively, "Defendants"), are infringing multiple claims of the '342 patent by making and selling mechanical closure devices covered by the patent.

Following my rulings denying Defendants' motion to exclude FloodBreak's damages expert and denying Defendants' motions for summary judgment except with respect to the direct infringement claim against Biebel, FloodBreak filed the instant application seeking, *inter alia*, a prejudgment remedy pursuant to Conn. Gen. Stat. § 52-278. FloodBreak contends that a prejudgment remedy to secure a total of $19,300,000 is warranted because there is probable cause to believe that a judgment in that amount will be rendered in its favor.

A hearing on the application was held from December 8, 2020 through December 10, 2020, during which multiple fact and expert witnesses testified and hundreds of exhibits were admitted into evidence. After considering all such evidence and the arguments propounded by both parties, I find probable cause that a judgment in an amount slightly less than what

FloodBreak seeks—$17,811,202—will be entered in its favor.  FloodBreak's application for a prejudgment remedy (doc. no. 239) is therefore **granted in substantial part.**

## I.      Standard of Review

Generally speaking, a prejudgment remedy is "intended to secure the satisfaction of a judgment should the plaintiff prevail."  *Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (citation omitted).  Under Connecticut law, a prejudgment remedy is appropriate if the court, "upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought and finds that a prejudgment remedy securing the judgment should be granted."  Conn. Gen. Stat. § 52-278d(a).[1]

Probable cause is a "flexible common sense standard," and has been defined as "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it."  *TES Franchising, LLC v. Feldman,* 286 Conn. 132, 137 (2008) (citation omitted).  It does not demand "that a belief be correct or more likely true than false" nor does it require "proof by a fair preponderance of the evidence."  *Id.* at 137 (citations omitted).  Instead, probable cause is determined by "weighing probabilities."  *Id*. at 142.

In considering an application for a prejudgment remedy, the court's function is "to determine whether there is probable cause to believe that a judgment will be rendered in favor of

---

[1] Connecticut's prejudgment remedy statute applies in federal court actions in this District.  *See* Fed. R. Civ. P. 64(a); *Roberts v. TriPlanet Partners, LLC,* 950 F. Supp. 2d 418, 420 (D. Conn. 2013) ("Federal Rule of Civil Procedure 64 provides that prejudgment remedies available under state law are also available to litigants in federal court.") (applying Conn. Gen. Stat. § 52-578d(a)).

the plaintiff in a trial on the merits." *Id*. at 411 (citation omitted).  Toward that end, courts must

consider "not only the plaintiff's claim but also any defenses raised by the defendant."  *Haxhi v.*

*Moss*, 25 Conn. App. 16, 20 (1991).

With respect to damages, the plaintiff must demonstrate "probable cause that a judgment

will issue in an amount equal to, or greater than, the amount of the prejudgment remedy sought."

*TES Franchising LLC v. Feldman*, 286 Conn. 132, 147 (2008).  The amount of damages need not

be determined "with mathematical precision," but there must be a "reasonable basis for

measuring" the plaintiff's loss.  *See Rafferty v. Noto Bros. Const., LLC*, 68 Conn. App. 685, 693

(2002) (citation omitted).

## II.    Discussion

### A.  Findings of Fact

Upon reviewing the briefs and considering all the evidence presented at the hearing, I

make the following findings of fact.

FloodBreak owns the '342 patent, which issued on September 5, 2017.  *See* Ex. 1.  The

'342 patent is directed to a flood prevention apparatus that can be installed in a ventilation shaft,

such as under a subway grating leading to an underground tunnel system like the New York City

subway.  *See id*. at Abstract.  The preamble provides that, "on threat of flooding," the apparatus

is "operable to prevent downward flood of surface water into the underground ventilation duct."

*Id*. at cols. 14–18.

Each of the four asserted independent claims—claims 1, 22, 23, and 24—include the

following limitations:  (a) "a support for arrangement in said shaft defining a passage between

top and bottom openings of the support for fluid communication of said ventilation duct up

through said support to said atmospheric opening;" and (b) "one or more panels having a profile

that closes said passage." *Id*.  Claim 1 also contains the limitation "one or more panels mounted in said support for . . . rotation downwardly from said upright home position solely by gravitational impetus on its own weight to a lower passage closing position." *Id*.  Claim 22 sets forth a similar limitation:  "one or more panels mounted in said support for rotation . . . from . . . an upright home position . . . in gravitational rotation falling solely under the impetus of its own weight . . . to a lower passage closing position." *Id*.

The New York City Metropolitan Transit Authority ("MTA") awarded eight contracts to seven contractors ("MTA Prime Contractors") for flood prevention work, each of whom bid for the opportunity to provide and install mechanical closure devices ("MCDs") for use in ventilation shafts in the New York City subway system.  *See* Tr. at 49:20–50:07.  Six of those awards went to contractors who used MCDs supplied by FloodBreak and covered by the '342 patent:  (1) Neelam Construction Corporation; (2) Earth Construction Corporation; (3) John C. Picone Inc.; (4) Zafra Minhas Construction LLC; (5) Zafra Minhas; and (6) Railroad Construction Company, Inc. ("RCC").  *See* Tr. at 57:24–58:5.  The remaining two awards went to contractors who bid MCDs supplied by AMI:  T. Moriarty & Sons, Inc. ("Moriarty") and Gramercy Group Inc. ("Gramercy").  *See* Exs. 249–51; Tr. at 40:12–14.

In early 2015, FloodBreak signed its first contract to supply MCD units to Earth Construction Corporation.  *See* Ex. 745.549 (indicating a January 2015 effective date).  Around that time, Christopher Taylor, an engineer with Arup Group Limited, had recommended Biebel, AMI's CEO, as someone who might be able to assist with fabrication work or with local contacts to help with field inspections, shop drawings, or installation work.  *See* Ex. 22; Tr. at 41:4–11. Louis Waters, FloodBreak's President, then reached out to Biebel to see if Biebel could provide assistance.  *See* Ex. 23.

About a year later, in March 2016, Waters learned that Biebel had been bidding against FloodBreak on an MTA contract with "a copy" of FloodBreak's MCDs.  *See* Tr. at 42:3–11; 45:16–19.  Waters thereafter explained to Biebel that FloodBreak had a patent pending on it.  *See* R. at 42:13–19.  After he informed Biebel of FloodBreak's patent application, Biebel assured Waters that he would withdraw his bid.  *Id*. at 43:21–24.  Biebel did not follow through on that promise.

On April 6, 2016, Biebel e-mailed RCC, informing them that he decided to manufacture a prototype MCD "to have for feel and touch in plant as well as wet test and certify to enable [RCC] to present same to MTA for approval."[2]  Ex. 254.  Biebel then asked Tucker Murphy from Beach Erectors[3] to send him FloodBreak's drawings that were submitted with FloodBreak's bid.  *Id*.  Biebel instructed Murphy to "tell them you're planning how to install and need real numbers to understand means and methods - use the 37612 job as a reference - weights handling etc."  *Id*.

The MTA required contractors using MCDs supplied by companies other than FloodBreak to seek approval to use those MCDs as an alternative to the approved MCD model manufactured by FloodBreak.  *See* Ex. 501; Tr. at 49:20–50:1.  Accordingly, around July 8, 2016, Beach Erectors submitted to the MTA the first of many "Or-Equal" submissions for Biebel's "equal" of FloodBreak's MCD.  *See* Ex. 258.1.  As part of the "Or-Equal" submission, Biebel submitted a letter dated June 15, 2016, which stated that "[n]othing in our design infringes on patents pending or received for this device or any IP rights owned by another manufacture[r]."  *See* Ex. 258.19.  The letter was "[s]worn and signed by" Biebel.  *Id*.

---

[2] The next day, on April 7, 2016, FloodBreak's application for the '342 patent was published and publicly available.  *See* Ex. 1.1 (Prior Publication Data).

[3] Beach Erectors, Inc. is a subcontractor of RCC.  *See* Tr. at 172:15–22.

On August 8, 2016, Kenneth Feng of New York City Transit e-mailed Michael Bruno of RCC about a Freedom of Information Law ("FOIL") request for AMI's "Or-Equal" submission. *See* Ex. 271.  In that e-mail, which was shared with Murphy and Biebel, Feng wrote that FloodBreak submitted the FOIL request "to determine . . . whether AMI has infringed on FloodBreak's intellectual property/patent(s)."  *Id.*  Separately, Murphy had also relayed to Biebel the MTA's concerns that he was infringing on FloodBreak's patent rights.  *See* Tr. at 208:5–209:21.

On January 4, 2017, Biebel received Drawings B-511 through B-514 from Lauren Anchor of J-Track LLC, which he referred to as "new drawings from MTA – (floodbreak)."  Ex. 255.  Biebel subsequently sent those drawings to his draftsman, Domenic Cartelli, instructing him to "[g]o thr[ough] all of these new details and include in our drawings."  Ex. 256.

After the '342 patent was issued on September 5, 2017, Biebel submitted another patent assurance letter dated October 10, 2017 as part of Gramercy's "Or-Equal" submission package. Ex. 261.22; Tr. at 202:21–204:07.  In that letter, Biebel affirmed that "[n]othing in our design infringes on patents pending or received for this device or any IP rights owned by another manufacture[r]."  Ex. 261.22.

On February 22, 2018, Edmond Bannon, counsel for FloodBreak, sent a letter to AMI accusing it of infringing FloodBreak's '342 patent.  *See* Ex. 693.  Once Biebel received the letter, he forwarded a copy to Guy Yale, a partner at the law firm Alix, Yale & Ristas ("AYR"), who had previously assisted Biebel with prosecuting a patent application for AMI's MCD.  *See* Tr. at 494:2–15; 509:5–511:11.  Yale and Tim Cieslak, an associate at the time, visited the AMI production facility to inspect AMI's MCDs on March 6, 2018.  *See* Tr. at 519:12–519:22. During the inspection, Yale orally communicated to Biebel that they were of the opinion that

AMI's MCD device did not infringe the '342 patent.  Tr. at 524:4-13.  That opinion was thereafter memorialized in an internal two-page memorandum, which was drafted by Cieslak. *See* Tr. at 527:8-145; *see also* Ex. 645.  The memorandum was not shared with Biebel.  Tr. at 528:2–4.

B. Expert Testimony

During the hearing, FloodBreak presented testimony from two experts regarding liability and damages.  FloodBreak's technical expert, Dr. Charles Reinholtz, testified that each of the types of AMI MCDs—standard, double-wide, double-long, single-door, and three-wide— infringe independent claims 1, 22, 23, and 24, as well as dependent claims 4, 5, 8, 10, 14, 20, and 21, and methodically discussed the bases for his conclusions.[4]  *See* Tr. at 279:1–317:20.  In particular, he testified that AMI's MCDs satisfy the limitation "one or more panels having a profile that closes said passage," explaining that the profile is "the outer portion that defines the shape of the panel" and that the panels are "rectangular," "match the shape of the passage closely," and "substantially fill up the passage" when in the closed position.  *See* Tr. at 297:13– 299:2.

Dr. Reinholtz further opined that, based on his inspection of a representative AMI MCD, the limitation in claim 1—"one or more panels mounted in said support for . . . rotation downwardly from said upright home position solely by gravitational impetus on its own weight to a lower passage closing position"—is satisfied, as is the similar limitation in claim 22.  *See* Tr. at 304:22–306:3; 314:19–315:10.  He elaborated that the panels are titled outwardly toward the closing position when they are in their upright home position and that "the center of gravity is

---

[4] Dr. Reinholtz testified that the single-door MCDs, however, do not infringe dependent claims 4 and 5 because those claims require multiple doors.  *See* Tr. at 316:17–25.

. . . even further in the closing direction" because of additional structure on the panels.  *See* Tr. at 306:21–307:6; 310:21–311:13.

Dr. Reinholtz additionally testified that the spring loaded pin on AMI's MCDs is an extraneous piece—that is, the pin is unnecessary to rotate the panel downwardly to a closed position.  *See* Tr. at 295:15–18.  To confirm that conclusion, Dr. Reinholtz ran tests that rendered the pin inert using a thin strap.  *See* Tr. at 307:20–308:1.  Because the panels still closed from their upright home position, the tests corroborate that the pins are not needed for the panels to fall solely under the impetus of gravity or their own weight.  *See* Tr. at 309:17–311:05.

Dr. Christine Meyer, FloodBreak's damages expert, testified that FloodBreak's total damages from lost profits due to lost sales and price erosion amount to $19.3 million, which she opined was a conservative estimate.  *See* Tr. at 391:14–19; 398:20–21.  She specified that lost profits due to lost sales equal $8.2 million and that damages due to price erosion equal $11.1 million, and explained in detail why each of the *Panduit* factors are satisfied.  *See* Tr. at 400:2–433:19.  She also testified that she considered each of the *Georgia-Pacific* factors in calculating a reasonable royalty and ultimately determined that a reasonable royalty of at least $19.3 million is appropriate here.  *See* Tr. at 433:21–436:13.

C. Conclusions of Law

After considering the entirety of the evidence before me, including the expert testimony, and based upon the above factual findings, I have reached the following conclusions of law.

First, probable cause exists that FloodBreak will prevail on its direct infringement claim against AMI.  In particular, there is probable cause that AMI's MCDs infringe claims 1, 4, 5, 8, 10, 14, and 20–24 of the '342 patent and all the limitations recited, including the following:  (a) "one or more panels having a profile that closes said passage;" and (b) "one or more panels

mounted in said support for rotation . . . solely by gravitational impetus on its own weight/solely

under the impetus of its own weight."[5]  Those conclusions rest in large part on Dr. Reinholtz's

credible testimony as well as my observations of photos and videos of the accused devices.

Second, principally because of several pieces of evidence that I discuss below, I conclude

that probable cause exists that FloodBreak will succeed on its induced infringement claim.

Finally, in light of Dr. Meyer's credible testimony and after accounting for one calculation error,

I conclude that probable cause exists that FloodBreak will secure a judgment in the amount of

$17,811,202.

In reaching those conclusions, I have considered each of the defenses that Defendants

have raised.  As I explain in further detail below, I conclude that those defenses are without merit

and do not foreclose FloodBreak's application with respect to liability or damages.

1. *Liability*

    a. The Defense That AMI's MCDs Do Not Have a Panel With a Profile That Closes
       a Passage Is Unavailing.

Defendants first mount the defense that the panels in AMI's MCDs do not have a profile

that closes the passage.  *See* Opp., Doc. No. 258, at 4.  It necessarily follows, they contend, that

AMI's products do not infringe the "one or more panels *having a profile* that closes said

passage" limitation.  *Id*. (emphasis added).  Relying on David Smith's expert report, they

elaborate that the opening of AMI's MCDs is instead closed "when the bottom surface of the

MCD panels interact with the flanges that protrude inwardly from the sidewalls of the MCD"

and that it is therefore "the face of the panel in the AMI [d]evice, not the profile of the panel that

---

[5] The only exception is with respect to AMI's single-door MCDs, which I conclude do not infringe
dependent claims 4 and 5.

closes the passage and keeps the water out." *Id*. at 5 (citing Smith Report, Doc. No. 142-26, at ¶ 64).

As an initial matter, the passages of Smith's report on which Defendants rely were not offered as an exhibit at the hearing, which renders Defendants' reliance on the report misplaced. At any rate, their argument is without merit because it is premised on an erroneous construction of the limitation.  In his report, Smith posits that "a [person of ordinary skill in the art] would understand that to close the passage, the profile would have to keep flood water from entering the ventilation shaft." *See* Doc. No. 180-6, at ¶ 63.  Applying that construction, Smith concludes that, because there are "gaps between the profile of the panel and the walls of the support in the AMI device" that are "large enough for water to flow through," the profile of the panels do not close the passage. *See id*. at ¶¶ 63–64.

In my prior claim construction ruling, however, I rejected Defendants' argument that the term "clos[ing] said passage" should be construed as sealing the passage.  As I explained, it is possible to accomplish closure of a device without sealing:

> There are other possible ways to close the perimeter of the panels, without the "profile" including wiper seals, that are completely consistent with the claimed invention. Thus, because it is possible to accomplish closure of the device without sealing the panel, it is unnecessary to import a limitation from the specification that is not in the claim.

*See* Doc. No. 94 at 8.  I therefore declined Defendants' invitation to construe the term "profile" narrowly to mean "distal portion of each panel that has outer edges that match the shape of the passage defined by the sidewalls and wiping seal positioned around the outer edges of the respective panel and positioned between the panel outer edge and sidewall when closed to prevent any leakage of flood water into the vent." *See id*. at 7.  Instead, I adopted the ordinary meaning of the term. *See id*. at 9.

To the extent Defendant propose a new construction of "profile" in their closing brief—"edge surface of a door"—that argument is equally unavailing.  *See* Doc. No. 279, at 16.  I did not endorse that interpretation in my claim construction ruling, and Defendants have offered no evidence to suggest that such a construction reflects the ordinary meaning of the term.

In sum, because their defense rests on an inaccurate interpretation of the limitation, and because Defendants have presented no expert testimony to rebut Dr. Reinholtz's opinion that the limitation is satisfied, their defense is unconvincing.

> b.  The Defense That AMI's MCD Panels Do Fall "Solely" Under the Impetus of Gravity or Their Own Weight Is Likely to Fail.

Defendants next raise the argument that AMI's MCDs do not satisfy the limitation that the panels rotate downwardly "solely" by gravitational impetus or under the impetus of their own weight.  *See* Opp., Doc. No. 258, at 5–6.  They contend that AMI's MCDs are equipped with a spring loaded pin "that activates after the panel release mechanism is manually engaged, and that pushes the MCD panels from the upright home position;" when "pushed from their upright home position by the spring loaded pin, they then rotate or fall under the impetus of more than just gravity or their own weight."  *Id*.  I am not persuaded.

Based on my observation of the accused MCDs and Dr. Reinholtz's testimony, the spring loaded pins are unnecessary to propel the panels into the closed horizontal position; accordingly, the panels can fall solely by gravitational impetus or under the impetus of their own weight.  Defendants, for their part, did not introduce any expert testimony to show that the spring loaded pins are necessary to operation of the accused MCDs.

That the spring loaded pins may operate to offer some additional force does not compel a conclusion to the contrary.  Although the parties should have raised the issue whether the limitation recites mere capability or actual operation at the *Markman* claim construction hearing,

11

I conclude that the limitation recites capability, principally because the limitation language specifies that the purpose of the panel is "for rotation." *See, e.g., Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1204–05 (Fed. Cir. 2010) (concluding that the claims in question, which recited components with specific purposes, i.e., "*for preventing* execution" and "*for obtaining* a Downloadable," described capabilities) (emphasis in original).

As the Federal Circuit has instructed, "to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode." *See id.* at 1204 (citation omitted). Accordingly, depending on the claim, "an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation." *See id.* (citation omitted). Applying those principles, I conclude that AMI's device is reasonably capable of satisfying the limitation at issue regardless of whether the spring loaded pin also exerts force, particularly in light of Dr. Reinholtz's testimony and demonstrations.

In brief, AMI's placement of an unnecessary spring-loaded pin in its MCDs does not defeat FloodBreak's showing that those MCDs infringe the limitation that the panels fall solely by gravitational impetus or under the impetus of their own weight, and thus does not negate my determination that probable cause exists to believe that FloodBreak will obtain a judgment on its claim of direct infringement.

> c. There is Probable Cause to Sustain FloodBreak's Claim that Biebel Induced Infringement.

Defendants, noting that I held at summary judgment that there is a triable issue of fact whether Biebel induced infringement of the '342 patent, argue that FloodBreak has not carried its burden of establishing probable cause that a judgment will be rendered against Biebel on the inducement claim. *See* Opp., Doc. No. 258, at 7–8. I disagree.

Under 35 U.S.C. § 271, "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  In order to prevail on an inducement claim, "the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal citations and quotation marks omitted).  Specific intent requires a showing that the alleged infringer "knew of the patent in question and knew the induced acts were infringing."  *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1925 (2015) (*citing Global-Tech Appliances, Inc. v. SEB S.A*, 563 U.S. 754 (2011)).

"The inducement knowledge requirement may be satisfied by a showing of actual knowledge or willful blindness."  *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015).  Willful blindness is a stringent standard, and requires that (1) "[t]he defendant must subjectively believe that there is a high probability that a fact exists," and (2) "the defendant must take deliberate actions to avoid learning of that fact."  *Global-Tech*, 563 U.S. at 769.  "Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  *Id.*  Moreover, although "proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice."  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (internal citations omitted).

In this case, Defendants assert that FloodBreak has failed to establish that Biebel was willfully blind, pointing to Biebel's testimony that (1) "he was working to develop his own proprietary ideas on his own technology and design;" (2) "by virtue of Section 10.04 of the MTA Prime contracts, AMI had a license to incorporate in the design and build of the AMI MCDs the

13

technology and ideas included in the MTA's 10PJ specifications even if those specifications included intellectual property otherwise owned by another party;" and (3) "he immediately sought advice of counsel" after receiving Bannon's letter accusing him of infringement.  *See* Doc. No. 279, at 24.

Even after taking into account Biebel's testimony and weighing his credibility, however, there is probable cause that a jury will find for FloodBreak on its induced infringement claim. FloodBreak has introduced ample evidence demonstrating that, as early as October 2017, Biebel knew that the '342 patent existed, subjectively believed that there was a high probability that his actions infringed the patent, and deliberately avoided confirming that it actually did.  Particularly revealing is the October 10, 2017 patent assurance letter, in which he guaranteed to the MTA that "[n]othing in our design infringes on patents pending or received for this device or any IP rights owned by another manufacture[r]."  An individual of "ordinary caution, prudence, and judgment" could certainly infer from the letter that Biebel—his testimony to the contrary notwithstanding—conducted a patent search beforehand and, through that search, learned that FloodBreak, a direct competitor, had a patent on its MCD technology.  *TES Franchising, LLC,* 286 Conn. at 137.  That is particularly so considering that the patent was publicly available and easy to locate, as Waters testified.  *See* Tr. at 119:21–23.

Such an individual could further infer that, once Biebel learned of the patent, he believed it was highly likely that his MCDs infringed the '342 patent and yet took deliberate steps to avoid learning whether they did until at least February 2018, when he sought an opinion of counsel.  *Info-Hold, Inc.*, 783 F.3d at 1373.  That conclusion is supported by evidence indicating that Biebel was previously put on notice of possible future infringement, including the August 8,

2016 e-mail from New York City Transit flagging the FOIL request and Murphy's comments to Biebel regarding the MTA's concerns.

Moreover, the January 4, 2017 e-mail exchange reveals that Biebel forwarded a number of FloodBreak's MCD drawings to his draftsman and instructed him to include them in AMI's drawings, which suggests that Biebel knowingly copied FloodBreak's MCD technology and further supports a finding of induced infringement. *See Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, 2014 WL 4090550, at *8 (N.D. Cal. Aug. 19, 2014) ("Evidence supporting an inference of copying may also be relevant to proving induced infringement.").

Probable cause also exists that a jury will find that Biebel willfully blinded himself to the infringing nature of the sales that he facilitated even after he received a vindicating opinion from counsel in February 2018. In order for an opinion of counsel to serve as a defense to liability pursuant to section 271(b), the opinion must be competent and the alleged infringer must have reasonably relied on it. *SDS USA, Inc. v. Ken Specialties, Inc*, 2002 WL 31055997, at *7–*8 (D.N.J. Aug. 28, 2002); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1191 (Fed. Cir. 1998). In assessing whether an opinion of counsel was competent, and whether it was reasonable for the accused infringer to rely on such guidance, courts consider the following factors: "(1) whether counsel examined the patent file history; (2) whether the opinions were oral or written; (3) the objectivity of the opinions; (4) whether the attorneys rendering the opinions were patent lawyers; (5) whether the opinions were detailed or merely conclusory; and (6) whether material information was withheld from the attorney." *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117, 1121 (E.D. Cal. 2002) (citing *Comark Communications, Inc.*, 156 F.3d at 1190–93; 7 Chisum, Chisum on Patents § 20.03[4][b][v][D], at 20–368 to 20–374 (2002)) (analyzing whether advice of counsel negated willful infringement liability, which

encompasses the same test—whether reliance was reasonable—as the induced infringement analysis).  Courts also consider "the level of the defendant's sophistication (especially about patent issues)."  *Sharper Image Corp. v. Honeywell Int'l, Inc.,* 222 F.R.D. 621, 632 (N.D. Cal. 2004) (addressing willful infringement claim).

As I explained in my summary judgment ruling on induced infringement (doc. no. 236), Yale's opinion was conveyed orally; the two-page memorandum in which the oral opinion was memorialized was cursory and did not cite to any law; in addition, Yale prepared and prosecuted a patent application for AMI's MCD, raising objectivity concerns.  Accordingly, although the memorandum does state that the file history for the '342 patent was reviewed, and even though Yale is a reputable patent lawyer, there is probable cause to believe that a jury will find it was unreasonable for Biebel to rely on Yale's guidance and that Biebel therefore continued to induce infringement with the requisite intent after February 2018.  That Biebel did not ask Yale to supplement his opinion even in the wake of my *Markman* or summary judgment rulings buttresses that finding.  *See id.* at 551:13–16.

For all the above reasons, there is probable cause that FloodBreak will succeed on its induced infringement claim.

> d.  The Defense That Defendants Were Granted A Royalty-Free License Under the MTA Prime Contracts is Unpersuasive.

Defendants also assert that the MTA Prime Contracts awarded the MTA an irrevocable, non-exclusive, and royalty-free license to the '342 patent and, in turn, entitled subcontractors including AMI to produce and supply MCDs covered by the patent to the MTA.  *See* Opp., Doc. No. 258, at 9–11.  That defense is without merit.

Article 10.08B of the MTA-Earth Construction Prime Contract contains a provision entitled "Patents, Copyrights and Infringement Claims," which reads as follows:

16

>If, pursuant to performance of the Work, the Contractor or any of its agents, officers, employees or subcontractors shall produce any patentable subject matter, the Authority, its respective subsidiaries shall thereupon have, **and are hereby granted,** without cost or expense, an irrevocable, non-exclusive, royalty-free license to make, have made, use or modify either themselves or by another contractor or other party on their behalf, such subject matter in connection with any work or any activity now or hereafter undertaken by or on behalf of the Authority, or any of its respective subsidiaries. The license herein granted shall not be transferable and shall not extend to contractors or other parties except to the extent of their work or activity on behalf of the Authority, or its subsidiaries.

*See* DX 745.113 (emphasis in original) ("patent-license clause").  "Work" is, in turn, defined as:

>all matters and things herein agreed to be constructed, furnished, installed, or done, by or on the part of the Contractor and includes Miscellaneous and Incidental Work.

*Id*. at 745.59.

In my August 27, 2020 summary judgment ruling, I held that the term "*shall* produce" is plainly forward-looking and thus only refers to subject matter produced after the contract was executed in January 2015.  *See* Doc. No. 235, at 9.  I further held that the term "produce" is ambiguous and could mean either "supply" as Defendants contended or "bringing into existence" as FloodBreak averred.  *See* Doc. No. 235, at 9–10.  For that reason, and because FloodBreak proffered sufficient evidence showing that the MCDs were brought into existence before the MTA Prime Contracts were executed,[6] I reasoned that a jury could reasonably find that one of the conditions that must be satisfied in order to trigger the patent license clause—that the patentable subject matter is "produced" after the execution of the contract—was not met.  *Id*. at 10–11.  I therefore declined to grant summary judgment to Defendants on the patent license defense.[7]  *Id*.

---

[6] FloodBreak has introduced evidence to that effect at the hearing.  For instance, Waters testified that the '342 patent invention was conceived and developed in 2013.  Tr. at 20:4–21:22.

[7] I also exercised my discretion to decline FloodBreak's request that I *sua sponte* grant summary judgment in its favor on the defense.  *Id*. at 11.

After considering the entirety of the record before me, I find it highly likely that FloodBreak's interpretation of "produce" will be controlling and that Defendants will therefore not prevail on the defense.  The parties do not dispute that the MTA Prime Contracts are governed by New York law, and under New York law, the ambiguous term must be construed in favor of the non-drafting party, which in this case is FloodBreak.  *See McCarthy v. Am. Int'l Grp.*, 283 F.3d 121, 124 (2d Cir. 2002) ("New York follows the well established *contra proferentem* principle which requires that 'equivocal contract provisions are generally to be construed against the drafter.'") (citations omitted).  Moreover, Defendants' interpretation of the provision would likely produce commercially unreasonable results, and "it is a well-established principle of New York contract law that a contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *AAR Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, 2014 WL 1807098, at *4 (S.D.N.Y. May 6, 2014) (internal quotation marks, alterations, and citation omitted).  Indeed, under Defendants' construction, a contractor that merely supplied a product to the MTA would be giving the MTA a non-exclusive, irrevocable, and royalty-free license to any future patent on that product, even if the product was developed entirely independently of the contractor's work for the MTA.  That license, in turn, would entitle the MTA to make or use, or have their contractors make or use, a sweeping number of patented products without paying any royalties. In my view, that would be an unreasonably steep price of admission for contractors seeking to work with the MTA.

For the foregoing reasons, there is not probable cause to believe that Defendants' patent-license defense will prevent a finding of liability.

Defendants advance a new defense in their closing brief:  that Article 10.08C of the

MTA-Earth Construction Prime Contract also entitles them to use the "ideas and methods"

represented in FloodBreak's drawings.  *See* Doc. No. 279, at 19.  Article 10.08C reads:

> All drawings, parts lists, data, and other papers of any type whatsoever, whether in the
> form of writing, figures or delineations, which have been or may be received from the
> Contractor at any time either prior or subsequent to execution of the Contract and which
> are prepared in connection with the Contract and submitted to the Authority shall become
> the property of the Authority, including the copyright thereto, which shall be deemed
> assigned to the Authority. Except to the extent that rights are held by Contractor or others
> under existing valid patents and are not given to the Authority, the Authority shall have
> the right to use, reproduce, and modify or permit the use, reproduction and modification
> of all such drawings, data, and other papers, and also any oral information of any nature
> whatsoever received by the Authority, and any ideas or methods represented by such
> papers and information, for any purpose in any media, and at any time without other
> compensation than that specifically provided herein, and no such papers or information
> shall be deemed to have been given in confidence and any statement or legend to the
> contrary on any of said drawings, data, or other papers shall be void and of no effect.

*See* Ex. 745.113.

The defense is untimely because Defendants did not raise it in their initial brief, and I

find the argument specious in any event.  Article 10.08C does not grant the MTA, its contractors,

or its subcontractors permission to *make* devices originating from ideas or methods reflected in

any drawings received.  Instead, Article 10.08C only grants the MTA the authority to "use,

reproduce, and modify"—or "permit the use, reproduction and modification" of—"any ideas or

methods represented" in drawings "prepared in connection with the Contract."  The failure to

include the term "make" is instructive in light of Article 10.08B, which, by contrast, explicitly

grants the MTA the right to both "use" and "make" patentable subject matter.  *See NFL

Enterprises LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (2008) ("The use of

different terms in the same agreement strongly implies that the terms are to be accorded different

meaning."); *Sterling Inv'r Servs., Inc. v. 1155 Nobo Assocs., LLC,* 818 N.Y.S.2d 513, 516 (2006)

("Under accepted canons of contract construction, when certain language is omitted from a

19

provision but placed in other provisions, it must be assumed that the omission was intentional.");

*Int'l Fid. Ins. Co. v. County of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000)

("Sophisticated lawyers . . . be presumed to know how to use parallel construction and identical

wording to impart identical meaning when they intend to do so, and how to use different words

and construction to establish distinctions in meaning.").

Reading the term "make" into Article 10.08C would be adding a term that is nowhere

found in that section, in contravention of the Second Circuit's explicit mandate. *See Law

Debenture Tr. Co. of New York v. Maverick Tube Corp.,* 595 F.3d 458, 468 (2d Cir. 2010)

("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used

and thereby make a new contract for the parties under the guise of interpreting the writing")

(applying New York law) (citation omitted).  I conclude that Article 10.08C therefore does not

grant AMI the authority to make MCDs covered by the '342 patent and thus does not absolve it

of liability in this case.

Finally, Article 10.08C articulates an explicit exception:  the ability to use, reproduce, or

modify applies only to documents "prepared in connection with the Contract" and does not

extend to "rights [that] are held by Contractor or others under existing valid patents and are not

given to the Authority." *See* Doc. No. 745.113.  Although the '342 patent had not yet been

issued when the contract was executed, Defendants have not persuasively shown that the

exception does not encompass rights under patents that were later issued.  And as was the case

with AMI's interpretation of Article 10.08B, such a construction would likely produce

commercially unreasonable outcomes, which would be contrary to New York's settled principles

of contract interpretation.  *See AAR Allen Servs. Inc.*, 2014 WL 1807098, at *4.

For the foregoing reasons, none of the raised defenses materially affects probable cause that FloodBreak will prevail at trial.

2. *Damages*

Relying principally on the opinion of Dr. Meyer, FloodBreak contends that there is probable cause to believe that it will secure a judgment of at least $19.3 million in damages. *See* Mem. in Support, Doc. No. 241, at 13. Defendants counter that Dr. Meyer's opinion is flawed in numerous respects and that it is more likely that FloodBreak suffered damages of less than $1 million. *See* Opp., Doc. No. 258, at 12–14.

A prevailing patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. "Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty [it] would have received through arms-length bargaining." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

To recover lost profits as damages, "a patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 971 (Fed. Cir. 2000). One way for a patentee to prove its entitlement to lost profits is to satisfy the four-factor test pronounced in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978). Under that test, a patentee must establish: "(1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made."[8] *Tate Access Floors, Inc.*, 222 F.3d at 971

---

[8] At summary judgment, I rejected Defendants' argument that FloodBreak failed to sufficiently establish the third element—that is, that FloodBreak had the capacity to produce MCDs beyond those that it sold. *See* Ruling, Doc. No. 237, at 12–24.

(internal citations and quotation marks omitted).  The patent owner bears the burden of proving

damages.  *Lucent Techs., Inc*, 580 F.3d at 1324.

Defendants lodge a number of objections to Dr. Meyer's damages analysis.  *First*,

Defendants challenge Dr. Meyer's assumption that the market for MCDs is a "two supplier

market," reasoning that (a) "Dr. Meyer does not differentiate between the demand for

mechanical closure devices generally and the demand for the specific claims provided by the

patented invention;" and (b) "Dr. Meyer does not account for evidence of MCD suppliers other

than AMI or FloodBreak."  *See* Opp., Doc. No. 258, at 12 (citing Hall Report, Doc. No. 259, at

¶¶ 58, 60).  Defendants also advance a related argument that Dr. Meyer "failed to consider any

evidence of acceptable non-infringing alternatives" and maintain that she concluded "with

virtually no analysis that there were none."  *See* Opp., Doc. No. 258, at 12 (citing Hall Report,

Doc. No. 259-1, at ¶¶ 63–68).

Notably, AMI's expert damages report, authored by Dawn Hall, was not offered into

evidence at the hearing, and Defendants introduced no expert testimony to counter Dr. Meyer's

and Dr. Reinholtz's statements that they saw no evidence of non-infringing substitutes available

in the marketplace.  *See* Tr. at 322:14–22; 406:9–12.  In fact, other than noting that other vendors

submitted price quotes to several MTA general contractors for the opportunity to supply MCDs,

Defendants have not pointed to any evidence suggesting that those vendors' products existed in

the market and were acceptable non-infringing substitutes to FloodBreak's MCDs.  *See* Tr. at

411:8–12 (Dr. Meyer: "I certainly saw a small number of statements that indicated that there may

have been other companies [that submitted bids to contractors for MCDs], but the nature of that

or anything related to those bids or even whether those were credible bids, I wasn't able to find

any evidence whatsoever.").  Defendants have, critically, proffered no evidence indicating that

those bids would have won "Or-Equal" approval from the MTA, which required meeting a host

of conditions set forth in Section 10PJ of the MTA Prime Contracts, without infringing the '342

patent.  *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1166 (Fed. Cir.

1991) ("If purchasers are motivated to purchase because of particular features of a product

available only from the patent owner and infringers, products without such features would

obviously not be *acceptable* noninfringing substitutes.") (emphasis in original).  That is

significant considering Dr. Reinholtz's testimony that it would be challenging, if not impossible,

to do so.  *Id*. at 325:24–326:7.  For those reasons, Defendants' attack on Dr. Meyer's opinion that

only two suppliers, and no acceptable non-infringing alternatives, existed in the market falls

short.

      To the extent Defendants argue that an acceptable non-infringing alternative was

available and could readily have been placed on the market, that is likewise unpersuasive.  "[T]o

be an acceptable non-infringing substitute, the product or process must have been available or on

the market at the time of infringement."  *Grain Processing Corp. v. Am. Maize-Prod. Co*., 185

F.3d 1341, 1349 (Fed. Cir. 1999) (citation omitted).  Where, as here, "an alleged substitute was

not on the market during the damages period, the accused infringer has the burden to overcome

the inference that the substitute was not 'available,'"  *SynQor, Inc. v. Artesyn Techs., Inc.,* 709

F.3d 1365, 1382 (Fed. Cir. 2013).  "Mere speculation or conclusory assertions will not suffice to

overcome the inference.  After all, the infringer chose to produce the infringing, rather than

noninfringing, product."  *Grain Processing Corp.*, 185 F.3d at 1353.

      In determining whether a substitute is "available," courts consider "the ease with which a

substitute was eventually made available, the state of the technology, and the availability of input

products and equipment."  *SynQor, Inc.,* 709 F.3d at 1382; *Siemens Med. Sols. USA, Inc. v.*

*Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1288 (Fed. Cir. 2011) ("A substitute need not be on sale at the time of infringement, but if the substitute cannot be commercialized 'readily,' then it is not available for purposes of a lost profits determination."); *see also Grain Processing Corp. v. Am. Maize-Prod. Co*., 185 F.3d 1341, 1353–55 (Fed. Cir. 1999) (affirming conclusion that non-infringing alternatives were available when (a) the defendant could "readily obtain all of the materials needed" for the non-infringing alternative; (b) the non-infringing alternative was "well known in the field" at the time of infringement; and (c) the defendant had "all of the necessary equipment, know-how, and experience to use" the non-infringing alternative).

With those principles in mind, I am not convinced that AMI had an "available" non-infringing alternative, in part because AMI has not sufficiently established the existence of an alternative design-around in the first instance. Although AMI's liability expert, David Smith, discusses in his report several design-around options that, according to him, would meet the MTA's specifications,[9] Dr. Reinholtz testified that all of those designs were "just concept drawings" rather than "fully developed designs" and, further, that "potential problems" existed with all of them. *See* Tr. at 326:13–17. Dr. Reinholtz additionally testified that he has not come across a non-infringing alternative design that satisfies all of the exacting requirements set forth in Section 10PJ. *See* Tr. at 326:3–7. Moreover, the fact that Defendants have not implemented any of the proposed designs despite FloodBreak largely prevailing at summary judgment suggests that the proposals could not have been readily commercialized.

*Second*, Defendants argue that, in evaluating whether FloodBreak could meet demand for the patented technology—the third *Panduit* factor—Dr. Meyer "ignored evidence of

---

[9] Pages 21 and 22 of Smith's expert report were admitted during the hearing.

FloodBreak's actual manufacturing problems, which resulted in delivery delays and concerns that occurred throughout 2017." *See* Opp., Doc. No. 258, at 13 (citing Hall Report, Doc. No. 259-1, at ¶¶ 69–73). Defendants, however, have identified only one delivery delay since FloodBreak began supplying MCDs in August 2015; that delay spanned a mere two months, concerned the production of just twenty-one MCD units, and was ultimately remedied. *See* Tr. at 139:20–24. For those reasons, and because Defendants have not pointed to any authority in support, I conclude that the short-lived delivery delay does not defeat FloodBreak's showing that it had adequate manufacturing capacity to meet the demand for MCDs. The evidence presented during the hearing, including the MCD Capacity Document, Waters' testimony, and Dr. Meyer's testimony, is more than sufficient to carry FloodBreak's burden. *See* Ex. 14 (MCD Capacity Document); Ex. 31; Tr. at 47:12–18. 50:25–51:8; 407:14–410:21.

*Third*, Defendants maintain that Dr. Meyer erroneously counted expected future lost profits from lost sales arising out of the Gramercy contract, which resulted in an over-estimate of around $1.5 million. *See* Opp., Doc. No. 258, at 13 (quoting Hall Report, Doc. No. 259-1, at 32 n.152). In its closing brief, FloodBreak acknowledges that those calculations were incorrect with respect to the double MCDs but not with respect to the standard MCDs. *See* Doc. No. 278, at 34.

After reviewing Dr. Meyer's calculations, I agree with Defendants. Dr. Meyer appears to have erroneously relied on the "contracted total" MCD quantity as opposed to the "expected future" MCD quantity in computing "expected future" but-for profits for both standard and double MCDs. *See* Exs. 39, 41. After correcting those errors, the expected future but-for profits from lost sales for the Gramercy contract on the MCDs equals $1,636,184, which is $1,488,798

less than the sum Dr. Meyer calculated.  Accordingly, I will reduce the requested prejudgment

remedy by that amount. [10]

    *Fourth*, Defendants take issue with Dr. Meyer's "but-for" prices, which were calculated

based on the prices that FloodBreak successfully bid on MTA Prime Contracts before AMI

started bidding on the contracts.  According to Defendants, Dr. Meyer overstates the amount of

lost profits damages because she assumes that FloodBreak's "but-for" prices were only affected

by AMI's infringement and therefore "ignor[es] evidence of effects to the market place for

mechanical closure devices including market forces and actual contract bids."  Opp., Doc. No.

258, at 13; *see also* Closing Brief, Doc. No. 279, at 38–39.  They elaborate that the bidding

process for the MTA Prime Contracts was competitive, and that FloodBreak would not have

made sales with Dr. Meyer's "but-for" pricing because those high prices would have caused the

general contractors to be out-bid by the next lowest contractor, which presumably would have

prompted the general contractors to search for another, lower-cost MCD supplier.  *See* Doc. No.

279 at 33, 35–36, 38–39.  Because FloodBreak negotiated pricing for the Zafra Minhas contracts

after AMI entered the MCD marketplace, Defendants argue, Dr. Meyer's "but-for" pricing

should be adjusted to reflect that reduced pricing.  *See id.* at 38–39.

    I am not persuaded.  Again, Defendant have not offered expert testimony to support their

arguments or otherwise refute Dr. Meyer's opinion regarding "but-for" pricing.  Further, a patent

holder "does not need to negate *all* possibilities that a purchaser might have bought a different

product or might have foregone the purchase altogether."  *State Indus., Inc. v. Mor-Flo Indus.,*

---

[10] I recognize that the amount FloodBreak requests might reflect a conservative estimate of what it will ultimately secure, partly because FloodBreak might be awarded treble damages for willful infringement.  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.,* 136 S. Ct. 1923, 1931–34 (2016) (discussing 35 U.S.C. § 284).  FloodBreak, however, did not seek enhanced damages in its application for a prejudgment remedy nor has FloodBreak quantified the enhanced damages it might receive, which leaves me unable to determine a "reasonable basis for measuring" such damages.  *Rafferty,* 68 Conn. App. at 693 (citation omitted).  For those reasons, I decline to award enhanced damages at this juncture.

*Inc.,* 883 F.2d 1573, 1577 (Fed. Cir. 1989) (citation omitted).  And as explained above,

Defendants' assertion that other vendors could have seriously competed with FloodBreak in

producing MCDs to the MTA is pure conjecture.  Even if several general contractors sought out,

or received bids from, other MCD suppliers, Defendants provide no details to suggest that those

suppliers could have manufactured non-infringing alternatives that would have satisfied the

MTA's demanding requirements.

In view of the foregoing, I find probable cause that, but for AMI's infringement, any

attempts by general contractors to secure cheaper sources of acceptable MCDs would have been

futile; the general contractors would therefore have had no choice but to hire FloodBreak as a

subcontractor.  Because FloodBreak would have been the only viable MCD supplier, FloodBreak

would have been able to charge the high prices that it did before AMI entered the marketplace

without jeopardizing the general contractors' chances of winning the prime contract.  I therefore

find that Dr. Meyer's prices accurately reflect what FloodBreak would have charged but for

AMI's infringement.  *See Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1350

(Fed. Cir. 1999) (explaining that the "but for" inquiry "requires a reconstruction of the market, as

it would have developed absent the infringing product, to determine what the patentee 'would . . .

have made,'" and that courts have allowed "patentees to present market reconstruction theories

showing all of the ways in which they would have been better off in the 'but for' world")

(internal citations omitted).

*Fifth*, Defendants argue that Dr. Meyer overstated FloodBreak's lost profits damages

because she underestimated the expenses that FloodBreak would have incurred to manufacture

additional MCDs under the Moriarty and Gramercy contracts.  *See* Opp., Doc. No. 258, at 13

(citing Hall Expert Report, Doc. No. 259-1, at ¶¶ 80–82).  Defendants specifically contend that

27

Dr. Meyer erroneously ignored FloodBreak's contract-specific profit and loss statements, *see* Ex.

4, which indicated the cost of goods sold, and urge me to discredit Dr. Meyer's calculations on

that basis.  *See* Doc. No. 279, at 37–38.

During the hearing, Dr. Meyer testified that she relied on another document in calculating

costs—a document that Waters described as a "report on . . . the costs that [FloodBreak] paid to

[its] fabricators for the single and standard units and the double units."[11]  *See* Ex. 3; Tr. at 49:8–

10; 421:5–8.  I conclude that it was appropriate for Dr. Meyer to rely on the MCDs'

manufacturing costs in calculating per unit costs, and Defendants offer no convincing argument

to the contrary.  Correspondingly, Defendant do not explain why the costs of goods sold as

reflected in the profit and loss statements constitute the proper measure of costs.  For those

reasons, I will not discredit Dr. Meyer's cost calculations on that ground.

*Sixth*, Defendants aver that price erosion is not an appropriate measure of damages and

raise multiple objections to Dr. Meyer's testimony regarding price erosion.  *See* Doc. No. 279, at

34.  Each objection falls short.

Defendants first assert that FloodBreak's prices were reduced before AMI bid on any of

the contracts at issue and that FloodBreak's reduced prices were "a direct result of market

competition entering the MTA's bidding war for MCD contracts, not AMI's infringement,"

emphasizing that "multiple prime contractors and suppliers participated in the MTA bidding

process."  *See* Doc. No. 279, at 35.  As Defendants acknowledge, however, both Waters and Dr.

Meyer testified at length that FloodBreak's discounts were offered in response to AMI's lower

pricing offers.  *See* Tr. 33:24–34:15; 36:2–37:7; 43:2–7; 44:2–45:12; 140:23–141:1; 424:14–

428:1; 425:11–16.  Moreover, as I have explained above, Defendants have failed to show that

---

[11] FloodBreak's third-party fabricators produced the MCD units.  Tr. at 59:14–20.

FloodBreak had any meaningful competition other than AMI, and "[i]n a market with only two viable competitors, one may infer that the patentee would have made the infringer's sales or charged higher prices but for the infringing competition." *Amstar Corp. v. Envirotech Corp.,* 823 F.2d 1538, 1543 (Fed. Cir. 1987); *see also Vulcan Eng'g Co. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1377 (Fed. Cir. 2002) ("For price erosion damages the patentee must show that, but for the infringement, it would have been able to charge and receive a higher price").

Defendants next assert that the MTA bidding process occurred before the '342 patent was issued in September 2017, and that "FloodBreak's price concessions resulting from competition *before* the patent even issued [on September 5, 2017] cannot be the basis of a claim for price erosion damages." *See* Doc. No. 279, at 35. Defendants provide no authority in support of that proposition, and after reconstructing the market as it would have developed without AMI's infringement as I must, I coclude that FloodBreak would have successfully negotiated higher prices once the '342 patent was issued, particularly because FloodBreak would have enjoyed a monopoly on the market. *Grain Processing Corp.,* 185 F.3d at 1350.

*Seventh*, Defendants briefly argue that Dr. Meyer's reasonable royalty calculation of $19.3 million is unsupported by the evidence and categorize the royalty as "absurd." *See* Doc. No. 279, at 39. I disagree.

In reaching her conclusion, Dr. Meyer testified that she applied the *Georgia-Pacific* framework to the facts of the case and explained which factors she deemed most important.[12] Tr.

---

[12] "The determination of a reasonable royalty . . . is based not on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would have agreed at the time the infringement began." *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986). The hypothetical negotiation approach, or the "willing licensor-licensee" approach, is the more common method of determining a reasonable royalty. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began." *Id.*

"The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Id*. at 1325. That is, "if infringement had not occurred, willing parties

at 434:11–436:23.  Moreover, a reasonable royalty of $19.3 million is far from absurd,

considering, as Dr. Meyer did, that (a) the patented invention was critical to AMI's success in the

marketplace, (b) FloodBreak had not previously licensed the '342 patent, and (c) both parties are

direct competitors bidding for the same contracts.  *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d

1538, 1554–55 (Fed. Cir. 1995) (affirming calculation of reasonable royalty rate equal to 50% of

estimated lost profits when (a) the patent at issue was a "pioneer" patent with clear commercial

success, (b) the patent owner followed a practice of exploiting its own patents rather than

licensing them to others, and (c) the patent owner would have had to forgo substantial profits by

granting a license to the infringing defendant, partly because the infringer was a key competitor).

    For the foregoing reasons, the defenses concerning damages do not foreclose my finding

of probable cause that FloodBreak will secure a judgment in the amount of $17,811,202.

    D.  <u>Motion for Disclosure of Assets</u>

    Pursuant to Conn. Gen. Stat § 52-278n, FloodBreak additionally moves for an order

requiring Defendants to disclose "the nature, existence, holders, and location of any and all

property in which it/he has interests" that is available for attachment and sufficient to satisfy the

prejudgment remedy.  *See* Mot., Doc. No. 239, at 13.

    Section 52-278n permits a court to order a disclosure of assets once a motion for

prejudgment remedy is granted.  *See* Conn. Gen. Stat. § 52-278n.  The statute specifically

instructs that, "[t]he court may, on motion of a party, order an appearing defendant to disclose

property in which he has an interest or debts owing to him sufficient to satisfy a prejudgment

---

would have executed a license agreement specifying a certain royalty payment scheme." *Id.*  The Federal Circuit
has applied the non-exhaustive factors outlined in *Georgia-Pacific v. U.S. Plywood Corp.,* 318 F. Supp. 1116, 1120
(S.D.N.Y. 1970), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.,* 446 F.2d 295 (2d
Cir. 1971), to ascertain a reasonable royalty through a hypothetical negotiation.

remedy." *Id*. § 52-278n(a).  It further provides:  "[t]he court may order disclosure at any time prior to final judgment after it has determined that the party filing the motion for disclosure has, pursuant to section 52-278d, 52-278e or 52-278i, probable cause sufficient for the granting of a prejudgment remedy."  *See id*. § 52-278n(c).

Defendants do not offer any opposition to the motion; they merely reserve the right to oppose the motion in further detail if and when a decision on probable cause is made.  *See* Opp., Doc. No. 258, at 1 n.1.  Because I have made a probable cause determination in FloodBreak's favor and substantially granted its motion for a prejudgment remedy, no further briefing is necessary and the motion for disclosure is **granted**.  Defendants shall, within twenty-one days of this ruling, disclose to FloodBreak the existence, location, and extent of any property, as defined by Conn. Gen. Stat. § 52-278a(e), sufficient to satisfy a total judgment in the amount of $17,811,202.

### E.  Motion for Waiver of Bond

Lastly, FloodBreak moves for the court to decline to order that it post bond in connection with the prejudgment remedy.  *See* Mot., Doc. No. 239, at 11.  FloodBreak contends that waiver of bond is warranted here because (a) the evidence developed makes it "very likely" that it will succeed on the merits; (b) the lengthy delay before the case can proceed to trial due to the COVID-19 pandemic already "disproportionately burdens" FloodBreak, and requiring it to post bond would "unduly add" to that burden; and (c) FloodBreak is in the position to satisfy any damages that might arise from the prejudgment remedy without bond.  *See id*. at 11–12.

Under section 52-278d, "[a]t any hearing on an application for a prejudgment remedy held pursuant to this section or upon motion of the defendant at any time after the granting of such application, the defendant may request that the plaintiff post a bond, with surety, in an

31

amount determined by the court to be sufficient to reasonably protect the defendant's interest in the property that is subject to the prejudgment remedy against damages that may be caused by the prejudgment remedy." Conn. Gen. Stat. § 52-278d(d). The statute continues, "[i]f the court grants the defendant's request, the bond shall provide that if judgment in the matter is rendered for the defendant or if the prejudgment remedy is dismissed or dissolved, the plaintiff will pay to the defendant damages directly caused by the prejudgment remedy." *Id*.

"In determining whether to grant a request for a bond and, if granted, the amount of the bond to be set, the court shall consider the nature of the property subject to the prejudgment remedy, the methods of retention or storage of the property and the potential harm to the defendant's interest in the property that the prejudgment remedy might cause." *Id*. § 52-278d(e).

Because Defendants have neither filed a motion for bond nor responded to FloodBreak's arguments, I am presented with no information from which I can determine whether the prejudgment remedy might cause Defendants harm. Accordingly, FloodBreak's motion is **granted**. Should Defendants seek bond, they may file a motion to that effect within 14 days of this ruling. The filing of any such motion shall not delay compliance with this order.

## III.   Conclusion

For the foregoing reasons, I find that there is probable cause that FloodBreak will prevail on its direct and induced infringement claims, and that a judgment of at least $17,811,202 will be rendered in its favor. Accordingly, the application for a prejudgment remedy (doc. no. 239) is **granted**, as is the motion for disclosure of assets and the motion for waiver of bond. Attachment of Defendants' property shall enter, sufficient to secure a judgment of $17,811,202.

The motion to seal (doc. no. 240) is also **granted**.  The parties are directed to file narrowly redacted versions of the memoranda in support of and in opposition to FloodBreak's application within 21 days of this order.

So ordered.

Dated at Bridgeport, Connecticut, this 22nd day of February 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge